No. 04-435

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 209

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

JOHN STANLEY JONES,

        Defendant and Appellant.

_____

APPEAL FROM:    District Court of the Tenth Judicial District,
In and for the County of Fergus, Cause No. DC 03-12
The Honorable E. Wayne Phillips, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Craig R. Buehler, Attorney at Law, Lewistown, Montana

    For Respondent:

        Hon. Mike McGrath, Attorney General; Mark W. Mattioli, Assistant
        Attorney General, Helena, Montana

        Thomas P. Meissner, County Attorney; Monte J. Boettger, Deputy County
        Attorney, Lewistown, Montana

_____

        Submitted on Briefs:  June 21, 2006

        Decided:  August 29, 2006

Filed:

_____
                    Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1      John Stanley Jones (Jones) appeals from an order from the Tenth Judicial District Court, Fergus County, denying his motion to suppress statements that he made to police during an interview and the coat he wore on the day Gisela Morris (Gisela) was murdered.  We affirm.

¶2      We address the following issues Jones presents on appeal:

¶3      1) Did the District Court err when it denied Jones's motion to suppress statements Jones provided to police officers during a December 31, 2002, interview?

¶4      2) Did the District Court err when it denied Jones's motion to suppress the coat that the police took from Jones's home?

## PROCEDURAL AND FACTUAL BACKGROUND

¶5      The night security patrol for the Eagles' Manor retirement home in Lewistown, Montana, discovered seventy-year-old Gisela dead in her apartment on the evening of December 16, 2002.  Gisela had died of severe blunt force injuries to her head, strangulation or suffocation, and four stab wounds to her neck.  Gisela also had been sexually assaulted before her death.  Fergus County police initiated the investigation by seeking to interview probationers and parolees who had not reported during the time period surrounding the homicide.  Fergus County Probation Officer Jim Simonich (Simonich) assisted the police in locating some of his probationers.

¶6      Simonich supervised Jones's probation.  Jones had failed to report to Simonich in early December 2002.  Simonich went with police to Jones's house, and informed Jones's brother and mother that the police wanted to talk to him.  Simonich issued an arrest

2

warrant for Jones's failure to report on December 30, 2002. Jones belatedly reported to Simonich on December 31, 2002. Simonich testified that Jones was "calm, polite, a little bit joking, . . . no different than he had been any other time that he reported." Simonich informed Jones that the police wanted to talk with him regarding the homicide that had occurred two weeks earlier. Jones said that he had nothing to hide and agreed to speak with police. Simonich called the police department to advise that Jones was on the way. Jones walked to the police station unaccompanied by Simonich.

¶7      Officer Travis Tilleman (Tilleman) spoke with Jones in an interview room at the police station and videotaped the conversation. The door to the interview room closed automatically, but was not locked. Tilleman promptly advised Jones of his *Miranda* rights. Jones signed the statement indicating that he understood his rights and also signed the waiver. The two engaged in what Tilleman described to be a "real free, full, and open conversation."

¶8      Jones denied having seen Gisela the day of the homicide, and provided a written statement detailing his whereabouts on the evening of the homicide. Tilleman inquired about a cut he noticed on Jones's hand and Jones responded that he received the cut in a fight with his friend on December 16, 2002. Jones permitted Tilleman to photograph his hand. Tilleman asked Jones whether he would be willing to undergo a rape kit examination. Jones replied that he would not mind and said, "I'm just here to do whatever you guys want." Tilleman next asked if Jones would have any problems taking a polygraph test. Jones responded that he had ADHD and an anxiety disorder that may

3

affect the results, so he would have to talk to an attorney first, but that he was "not saying [he] wouldn't."

¶9 Tilleman asked Jones what he was wearing on December 16, 2002, and Jones replied that he was wearing black jeans and a red and black Columbia coat. Tilleman asked whether the police could look at the coat. Jones replied, "sure" and informed Tilleman that Jones had the coat at home. Tilleman then suggested that they could go to Jones's home to "go get" the coat following the interview. Tilleman stated that he was going to check on some things and left the room.

¶10 Captain Dave Sanders (Sanders) returned to the interview room instead of Tilleman. Sanders stated that discrepancies existed between what Jones had told Tilleman and what witness accounts reported. Jones then promptly informed Sanders that he had in fact seen Gisela the day of the homicide. Sanders asked why Jones had told Tilleman that he had not seen Gisela for several months. Jones argued that Tilleman had narrowed his inquiry to Jones's actions after 3:00 or 4:00 PM on December 16, 2002, and that Jones had visited Gisela earlier that day. Sanders then employed the "guilt assumption technique" and informed Jones that the police "investigation demonstrates that you were the person that did this." Jones stated that he was through talking and that "[i]f you're gonna arrest me, just arrest me. I don't want to sit here and listen to you." Nonetheless, Jones kept talking and continued to deny his involvement in the crime.

¶11 Sanders asked if Jones would be willing to submit to a polygraph test, and again Jones stated that he would have to first talk to an attorney. Sanders left the room and Jones smoked a cigarette. Sanders returned and asked if Jones was willing to continue

4

talking and if Jones still would allow the police to look at the coat Jones had been wearing on December 16, 2002. Jones responded affirmatively and stated that he had nothing to hide. Sanders asked if Jones had walked or driven to the station. Jones had walked, and Sanders said, "[w]e'll just give you a ride."

¶12 Tilleman drove a squad car the mile-and-a-half from the police station to Jones's home with Jones and Sanders in the back. Jones went to his room, retrieved the coat, and brought it to the kitchen area. Tilleman and Sanders testified that Jones signed a consent form before relinquishing the coat. Jones stated that the officers first took possession of the coat and that he signed the consent form afterwards. The officers then left Jones's home.

¶13 Sanders telephoned Jones shortly after police returned to the station and an inspection of the coat had revealed blood stains. Sanders asked Jones if he would be willing to return to the station for a second interview. Jones agreed and appeared shortly after the phone call. Jones and Sanders returned to the interview room. The officers again videotaped the conversation. Sanders advised Jones of his *Miranda* rights for the second time that day. Jones signed a form acknowledging that he both understood his rights and that he chose to waive them. Sanders asked Jones more questions that employed the guilt assumption technique. For example, Sanders made statements repeatedly to the effect that he knew it would take courage, but that Jones should just tell Sanders what happened. Sanders also stated frequently that he knew Jones had a conscience.

¶14 Jones left the station and did not return until January 2, 2003, when Sanders

telephoned and asked Jones again if he was willing to come in for an interview. Jones appeared at the station a third time. Sanders again provided to Jones *Miranda* warnings in the same interview room used before. Jones promptly invoked his rights. Sanders ended the interview. Law enforcement did not have further contact with Jones until they arrested him on March 4, 2003, for deliberate homicide, sexual intercourse without consent, aggravated burglary, and commission of an offense with a dangerous weapon.

¶15    Jones filed a motion to suppress the statements he made during the December 31, 2002, interviews and the coat police acquired from his home. The District Court held a two-and-a-half-day suppression hearing and received testimony from various witnesses including Tilleman, Simonich, and Jones. The court also reviewed—at least twice—the videotapes of Jones's interviews. The court concluded that Jones made the statements on December 31, 2002, voluntarily, and that law enforcement did not violate Jones's Fifth Amendment rights. The court also concluded that police did not violate Jones's Fourth Amendment rights when they seized his coat. Consequently, the District Court denied Jones's motions to suppress.

¶16    Following a fourteen-day trial held in January and February 2004, a jury convicted Jones of deliberate homicide, aggravated burglary, and commission of an offense with a dangerous weapon. Jones appeals the District Court's decision to deny his motions to suppress.

**STANDARD OF REVIEW**

¶17    We engage in a twofold review of a district court's denial of a motion to suppress. *State v. McCollom*, 2005 MT 61, ¶ 7, 326 Mont. 251, ¶ 7, 109 P.3d 215, ¶ 7. We initially

6

review the court's findings of fact to determine whether they are clearly erroneous. *McCollom*, ¶ 7. A finding of fact is clearly erroneous if substantial evidence does not support it, if the district court misapprehended the effect of that evidence, or if a review of the record leaves this Court with the definite and firm conviction that the district court made a mistake. *McCollom*, ¶ 7. We then engage in a plenary review of the conclusions of law to determine whether the district court's interpretation of the law is correct. *McCollom*, ¶ 7. The specific question of whether a defendant has given a voluntary confession "'is largely a factual determination that is within the discretion of the district court.'" *State v. Hill*, 2000 MT 308, ¶ 37, 302 Mont. 415, ¶ 37, 14 P.3d 1237, ¶ 37 (quoting *State v. Grey*, 274 Mont. 206, 209, 907 P.2d 951, 953 (1995)).

## DISCUSSION

¶18 Jones argues that this Court should reverse the District Court and grant his motion to suppress statements he made to officers on December 31, 2002, and suppress the coat police seized that same day. Jones premises his argument on the fact that his probation officer, Simonich, forced him to appear at the police station initially, and thus, any statements made thereafter were involuntary. Jones also claims that the totality of the circumstances surrounding the interview demonstrate involuntariness independent of the manner in which he appeared at the station. Finally, Jones contends that the police obtained information and Jones's consent regarding the coat Jones wore on December 16, 2002, only as a result of the involuntary statements and an illegal consent form, and consequently, the District Court should have suppressed evidence of the coat.

7

**ISSUE ONE**

¶19     Did the District Court err when it denied Jones's motion to suppress statements Jones provided to police officers during a December 31, 2002 interview?

¶20     Section 46-13-301(1), MCA, permits a defendant to move to suppress a confession or admission if it was given involuntarily.  The statute places the burden on the state to prove by a preponderance of the evidence that the confession or admission was voluntarily given.  Section 46-13-301(2), MCA; *State v. Maestas*, 2006 MT 101, ¶ 17, 332 Mont. 140, ¶ 17, 136 P.3d 514, ¶ 17.  Voluntariness depends upon the totality of the circumstances.  *State v. Reavley*, 2003 MT 298, ¶ 15, 318 Mont. 150, ¶ 15, 79 P.3d 270, ¶ 15.

¶21     The totality of the circumstances includes the defendant's age, experience, education level, the defendant's prior experience with the criminal justice system and police interrogation, whether the accused was advised of his *Miranda* rights, and whether the police used impermissible practices to extract incriminating statements from the defendant.  *Reavley*, ¶ 15.  The court should consider any physical coercion, psychological coercion, deception, use of threats, and direct or implied promises when determining whether police employed impermissible practices to extract incriminating statements from the defendant.  *State v. Hoffman*, 2003 MT 26, ¶¶ 18-19, 314 Mont. 155, ¶¶ 18-19, 64 P.3d 1013, ¶¶ 18-19.  We analyze each factor in turn.

¶22     Jones's personal attributes

¶23     Jones's age, experience, education level, and prior experience with the criminal justice system and police interrogation support a conclusion that Jones provided the

8

statements to police voluntarily. Jones was 35 years old at the time of the interviews. The District Court found that Jones could read and write and that he completed the 11th grade. Although it took him three tries, Jones earned his GED. Jones has held several jobs over his life, considers himself "pretty intelligent," and stated that he enjoyed reading adult mysteries.

¶24 Moreover, Jones had significant experience with the criminal justice system. Jones had been convicted of six felonies. Jones knew how to assert his rights, as evidenced by the fact that he declined requests by both Sanders and Tilleman to submit a polygraph test without first speaking with an attorney. Jones also knew how to terminate a police interview, as he demonstrated when he stated promptly that he would have to speak with a lawyer before answering further questions when the third interview with police commenced on January 2, 2003. Further, the District Court included in its findings of fact that Tilleman interrogated Jones previously in 2001 and that Jones "voluntarily left that interview. . . ." These factors weigh in favor of the voluntary nature of the statements Jones provided on December 31, 2002.

¶25 *Miranda* warnings

¶26 The presence of timely and complete *Miranda* warnings further supports a finding of voluntariness. *Reavley,* ¶ 15. An individual may waive his *Miranda* rights only if the waiver has been made voluntarily, knowingly, and intelligently. *State v. Lawrence*, 285 Mont. 140, 148, 948 P.2d 186, 191 (1997). Officers provided *Miranda* warnings to Jones before they began asking him questions at the first interview on December 31, 2002. The officers then repeated the *Miranda* warnings when the second interview began only two

9

hours later. Jones does not argue on appeal the sufficiency of these *Miranda* warnings, or that he did not provide the waiver voluntarily, knowingly, and intelligently. Jones does argue, however, that he unequivocally invoked his right to counsel when he stated that he was "through talking." The State responds by asserting that Jones's statements were not clear, unambiguous, and unequivocal. *See Reavley*, ¶ 21. The State argues additionally that the officers provided *Miranda* warnings gratuitously since they never subjected Jones to "custodial interrogation." *See State v. Dawson*, 1999 MT 171, ¶ 30, 295 Mont. 212, ¶ 30, 983 P.2d 916, ¶ 30 (stating that *Miranda* warnings are only required if the accused is subjected to a "custodial interrogation").

¶27 We conclude that regardless of whether the police subjected Jones to a "custodial interrogation," Jones's statements that he was "through talking" do not constitute an unequivocal invocation of his right to counsel or to remain silent on the facts of this case. The District Court sits in the best position to assess the credibility of witnesses and weigh the testimony. *Spooner Const. & Tree Serv., Inc. v. Maner*, 2003 MT 43, ¶ 35, 314 Mont. 268, ¶ 35, 66 P.3d 263, ¶ 35. The court specifically found, after reviewing the tapes and hearing Jones's oral testimony, that "the subsequent conversation was not conducted against [Jones's] will . . . ." The videotape demonstrates that Jones said that he was "through talking," but yet continued talking unprompted by Sanders. Substantial evidence supports the District Court's finding that Jones did not unequivocally invoke his *Miranda* rights. The presence of sufficient *Miranda* warnings and the fact that Jones did not invoke his rights further supports the State's position that Jones made his statements voluntarily. *See Reavley*, ¶ 14.

¶28 <u>Practices used to extract incriminating statements</u>

¶29 Jones asserts that Sanders's use of the "guilt assumption technique" of questioning rendered Jones's statements involuntary. Jones does not allege, however, that Sanders ever lied to him. The State admits that Sanders employed a "guilt assumption technique" when he spoke with Jones on both occasions.

¶30 In *State v. Hill*, 2000 MT 308, 302 Mont. 415, 14 P.3d 1237, we analyzed the voluntariness of Hill's statements under the totality of the circumstances test. As here, Hill argued that the police used impermissible practices to extract statements from him. We concluded that when the police merely confronted Hill with physical evidence and "appealed to Hill's morality in asking for an admission but did not promise or threaten any particular treatment," that such actions did not amount to impermissible practices. *Hill*, ¶ 45. We noted that the police did not ever mislead Hill about the evidence against him, *Hill*, ¶ 45, and affirmed the district court's decision to admit his statements. *Hill*, ¶ 48.

¶31 As in *Hill*, the police here did not ever mislead or lie to Jones. Thus, the use of the guilt assumption technique, without more, does not constitute such physical or psychological coercion, deception, threats, or promises sufficient to tip the totality of the circumstances test in Jones's favor. *Hill*, ¶¶ 45, 48.

¶32 Jones also claims that Simonich forced him to speak with police initially when Simonich advised Jones that Jones "needed" to talk with law enforcement and informed Jones's family the day before that he needed to see Jones. Jones reasons that any statements he made after appearing at the police station are the result of the exploitation

11

of an illegal act and should be suppressed. *See generally State v. Bilant*, 2001 MT 249, ¶ 22, 307 Mont. 113, ¶ 22, 36 P.3d 883, ¶ 22. Jones points also to Simonich's actions of calling the police department while Jones was in his office to set up the police interview and Simonich issuing an arrest warrant for Jones based on his failure to report as further evidence of Jones's involuntary appearance at the police station.

¶33 Jones's mother testified that when she told her son on December 30, 2002—the day before Jones met with Simonich—that the police wanted to speak with him, he responded, "I've got nothing to hide; I'll go." Simonich testified that he did not tell Jones that he had issued a warrant for Jones's arrest, and thus, did not use the arrest warrant to threaten Jones. Jones walked unescorted to the police station after leaving Simonich's office and stated repeatedly that he would talk to police because he "had nothing to hide." Further, Jones returned to the police station a second time, prompted only by Sanders's phone call asking him if he was willing to come in and answer more questions. Taking into consideration these facts, and the totality of the circumstances, including Jones's personal attributes addressed in ¶¶ 23-24, we conclude that Simonich did not compel Jones to speak with police. Thus, Jones's statements did not result from an illegal act and do not warrant exclusion. *See Bilant*, ¶ 22.

## ISSUE TWO

¶34 Did the District Court err when it denied Jones's motion to suppress the coat the police took from Jones's home?

¶35 Jones argues that the coat should be excluded from evidence because the police only had knowledge of its existence due to the involuntary statements Jones made during

12

the first two interviews. We resolved this issue above, however, when we concluded that all Jones's statements to officers were voluntary. Such statements include Jones informing the police what he was wearing on December 16, 2002, as well as his affirmative response to Tilleman's request to take a look at the coat. We deem Jones's argument on this point meritless.

¶36 Jones asserts next that the signed form that provided consent for officers to remove the coat from his home is invalid. Although warrantless searches are per se unreasonable, knowing and voluntary consent by a citizen to a search is a recognized exception to the warrant requirement. *State v. Olson*, 2002 MT 211, ¶ 20, 311 Mont. 270, ¶ 20, 55 P.3d 935, ¶ 20. The prosecution carries the burden of establishing that consent to a warrantless search was freely and voluntarily given and uncontaminated by any express or implied duress or coercion. *Olson*, ¶ 20.

¶37 Jones argues that the fact he did not sign the consent form until after the State already seized the coat automatically renders the consent invalid. Jones cites *Olson* in support of this argument. In *Olson*, officers entered the kitchen of Kathy Olson (Olson), and arrested her pursuant to a lawful arrest warrant. *Olson*, ¶ 3. An officer conducted a search of the entire home after the arrest and discovered dangerous drugs and paraphernalia. *Olson*, ¶ 5. Olson, in handcuffs, then provided written consent for officers to search her home. *Olson*, ¶ 5. We considered on appeal the district court's decision to deny Olson's motion to suppress the drug evidence. *Olson*, ¶ 2. We deemed the search a violation of Olson's Fourth Amendment rights and stated that "[c]onsent to a search is not voluntary where it is given only after law enforcement already has

13

conducted an illegal search because the consent flows directly from the unlawful intrusion." *Olson*, ¶ 22.

¶38   The parties here dispute the precise timing of when Jones signed the consent form. Tilleman testified that Jones signed the consent form and relinquished his coat contemporaneously.  Sanders testified that Jones relinquished the coat after signing the consent form.   Testimony that Tilleman provided later comported with Sanders's testimony.   More importantly, Jones's signing of a written consent form simply memorialized the oral consent that Jones provided.  The only question would be whether Jones freely and voluntarily provided his oral consent before the officers seized his coat. We determined that all of Jones's statements to the police, including his affirmative response to Tilleman's request to take a look at the coat, were given freely and voluntarily.  We conclude that Jones provided his oral consent before the officers took possession of his coat.

¶39   Thus, even if Jones provided his written consent simultaneously with the officers' possession of the coat, or even after the officers took possession of the coat, such consent is valid.   In contrast to *Olson*, the police here did not discover the coat pursuant to an illegal search.  As discussed in ¶¶ 18-33, above, Jones provided all statements voluntarily and the police operated consistently within the parameters of Jones's constitutional rights. As there was no illegal search or evidence acquired, the precise timing of when Jones signed the written consent form does not affect our conclusion that Jones's consent for officers to seize his coat is valid.  The State has met its burden of demonstrating that Jones freely and voluntarily consented to the officers' seizure of his coat.  *See Olson*, ¶

14

20. Whether Jones's ensuing memorialization of his free and voluntary oral consent took place before or after the officers took possession of his coat is irrelevant.

¶40    Finally, Jones asserts that his consent to "look at" the coat did not also translate into consent to seize the coat. The written consent form Jones signed includes language that grants the Lewistown Police Department permission to "conduct a complete search of the premises" and "permission to take from [the] premises" anything the police deem evidence for criminal prosecution. Jones signed the consent form voluntarily. *See* ¶ 37, above. Thus, we are not persuaded by this argument in light of the consent form's plain language.

## CONCLUSION

¶41    The State has met its burden to prove that it did not illegally coerce Jones into making statements to officers. The State has also proven that Jones provided them with consent to seize the coat Jones wore on the day of the homicide voluntarily. Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON