DA 06-0156

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 262

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

SABINE HALVORSON BIEBER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 2003-563
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Robert L. Stephens, Jr., Southside Law Center, Billings, Montana

      For Appellee:

      Hon. Mike McGrath, Montana Attorney General, Kathy Seeley,
Assistant Attorney General, Carlo Canty, Assistant Attorney General,
Helena, Montana

      Dennis Paxinos, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  January 17, 2007

Decided:  October 19, 2007

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 In January 2003, one-year old Dane Heggem (Dane) died while in the care of the Tiny Tots Daycare located in Laurel, Montana (Tiny Tots), and co-owned by Sabine Bieber (Bieber) and Denise Smith (Smith). Postmortem testing revealed that Dane had an elevated level of diphenhydramine (DPH) in his system. DPH is an active ingredient in cold and allergy medications such as Benadryl® and has strong sedative properties. Further investigation indicated that the DPH had been administered to Dane at Tiny Tots. Bieber was subsequently charged with one count of negligent homicide, three counts of criminal endangerment, and one count of tampering with physical evidence, all felony charges. A jury found her guilty of negligent homicide and two counts of criminal endangerment. Bieber appeals. We affirm.

## ISSUES

¶2 A restatement of Bieber's issues on appeal is:

¶3 Did the District Court err when it denied her Motion to Suppress?

¶4 Did the District Court abuse its discretion in admitting the opinion testimony of the State's expert and in refusing to conduct a *Daubert* hearing?

¶5 Did the District Court abuse its discretion in admitting M. R. Evid. 404(b) (Rule 404(b)) evidence of "other acts" and refusing offered cautionary instructions?

¶6 Did the District Court abuse its discretion in refusing offered defense jury instructions?

¶7    Did the District Court abuse its discretion in failing to instruct the jury in response to jury questions and in subsequently providing an *Allen*-type instruction after the jury was deadlocked?

¶8    Is reversal for cumulative error required?

## FACTUAL AND PROCEDURAL BACKGROUND

¶9    On January 31, 2003, at approximately 2:45 p.m., the Laurel Police Department (LPD) dispatcher received an emergency call from Tiny Tots reporting that a one-year old child at the facility was not breathing.  When ambulance staff arrived, they learned that Dane had not responded to cardiopulmonary resuscitation (CPR) being performed by Bieber.  He was not breathing, was slightly blue in color and unresponsive.  He was transported by helicopter to St. Vincent's Hospital in Billings where he was pronounced dead at 3:49 p.m.

¶10    While Dane was being transported to Billings, officers from the LPD arrived at the day-care.  Bieber and Smith consented to a police search of the facility at that time and both Bieber and Smith described the day's events leading up to the emergency call to 9-1-1.  Neither woman mentioned administering any medication to Dane.

¶11    An autopsy was performed on February 2, 2003, resulting in a preliminary conclusion of a natural death.  A subsequent toxicology report issued around February 11, 2003, however, revealed "quite elevated" DPH levels in Dane's blood and urine. According to the police investigation to that date, Dane was not ill on January 31 nor had his parents given him any prescription or over-the-counter (OTC) medication on January 31.  His parents also reported that Dane had not received nor needed any medication

during the several weeks leading up to the day of his death. Upon notification of the toxicology results, the LPD contacted the Montana Department of Justice (DOJ) and Agent Gary Hatfield (Hatfield) was assigned to assist the LPD with its investigation.

¶12 Subsequent interviews with Dane's parents revealed that his mother had given Dane a pediatrician-recommended dosage of DPH on two occasions only since his birth—once when Dane was around six months and the other time in mid-December 2002. Both times were to counteract allergic reactions. She said that, to her knowledge, Dane had not had any medication containing DPH since mid-December 2002. Dane's mother also told investigators that the only medication she authorized Tiny Tots to administer to Dane was gas relief drops developed for infants and children.

¶13 On February 14, 2003, a Department of Public Health and Human Services (DPHHS or the Department[1]) day-care inspector, Tana Johnson, arrived at Tiny Tots to conduct an unannounced inspection and investigation. Hatfield had arranged with Johnson's DPHHS supervisor to attend the inspection as well. Johnson and Hatfield arrived at approximately 10:30 a.m. Johnson explained that she was there to conduct a regulatory inspection and Hatfield introduced himself. Hatfield claims to have told Bieber at or near the front door that he was conducting a criminal investigation in conjunction with the LPD, and indicated he asked Bieber to sign a consent form, which she did. Bieber claims that Hatfield did not identify himself as a criminal investigator until the facility inspection was concluded and it was then that he requested that she sign a consent form.

---

[1] DPHHS licenses and regulates day-care facilities in Montana. Section 52-2-721, MCA.

4

¶14    Near the end of a room-by-room facility tour, Johnson noticed a clear plastic dose cup generally packaged with OTC liquid medicines. The dose cup which was filled with a red liquid to a line indicating "adult dosage" was on an open kitchen shelf next to a full baby bottle that appeared to contain baby formula. When questioned by Johnson, Bieber indicated it was DPH and showed Johnson the 12-ounce bottle of Diphedryl from which it had been poured. Johnson asked the age of the child to receive the medication and Bieber told her it was for a six-year old and that the child's mother had poured out the dose when she dropped her child off that morning. However, according to the forms signed by parents authorizing day-care staff to administer medication, there was no authorization by the six-year old child's parents to administer DPH. When Johnson advised Bieber that she would receive a written deficiency for failing to obtain permission in writing from the parents for this particular medication, Bieber took the full dose cup and dropped it into a sink of soapy dishwater. Hatfield retrieved the cup from the sink, photographed it, the bottle of Diphedryl and the general area, and put both the dose cup and the Diphedryl bottle into evidence containers and later transferred them to LPD for submission for analysis. Subsequent analysis revealed the presence of DPH in both items.

¶15    After leaving Tiny Tots, Johnson and Hatfield contacted the six-year old child's mother who had purportedly poured the dose cup. She denied having done so; therefore, Johnson and Hatfield decided to interview other parents of children attending Tiny Tots Daycare. The parents of an eight-month old child authorized Hatfield to submit recently-disposed of diapers for testing for foreign substances in their child's urine. Analysis

indicated that two of three diapers revealed the presence of doxylamine, an antihistamine with sedative properties that should not be administered to children less than twelve years of age without doctor's orders. Upon notification that the child's diapers contained doxylamine, the child's mother reported that she had not given the child any medication for several days leading up to the day the diapers were disposed of nor had Bieber or Smith told her that either of them had administered medication to her child.

¶16    With parental permission, other children's diapers were collected and analyzed and the presence of DPH was detected. After being told by one of the older children attending the day-care that all the children got dark-colored liquid medicine at lunch time, this child provided a urine sample which likewise tested positive for DPH.

¶17    On February 21, 2003, the doctor who performed the autopsy amended his report to conclude that Dane's cause of death was "undetermined" rather than "natural." On February 26, 2003, DPHHS suspended the registration of Tiny Tots as a group day-care facility. On March 12, 2003, Dane's death certificate was issued with a finding that the cause of death was DPH toxicity and the manner of death was homicide.

¶18    On July 14, 2003, the State's motion for leave to file an Information against Bieber and Smith was granted. Both women were charged with one count of felony negligent homicide, three counts of felony criminal endangerment, and one count of felony tampering with physical evidence. Arrest warrants were issued. On March 25, 2004, the State's motion to dismiss charges against Smith without prejudice was granted. The case then proceeded exclusively against Bieber. A jury trial was held from August 16–30, 2005, at the conclusion of which the jury found Bieber guilty of negligent

homicide relative to Dane, and two counts of criminal endangerment for knowingly engaging in conduct that created a substantial risk of death or serious bodily injury to two other young children who attended the day-care. In October 2005 Bieber was sentenced to a term of twenty years in the Montana Women's Prison with fifteen suspended for the negligent homicide charge. She was sentenced to a term of ten years, all suspended, for each criminal endangerment count to run consecutively to the homicide count. She filed a timely appeal.

¶19 Additional facts will be addressed below as needed for our analyses.

## STANDARDS OF REVIEW

¶20 *Motion to Suppress*: The standard of review of a district court's denial of a motion to suppress evidence is whether the court's findings are clearly erroneous. To determine whether a finding of fact is clearly erroneous, this Court ascertains whether the finding is supported by substantial evidence, whether the district court misapprehended the effect of the evidence, and whether the Court is nevertheless left with a definite and firm conviction that the district court made a mistake. We further review a district court's denial of a motion to suppress to determine whether the court's interpretation and application of the law are correct. This Court's review is plenary as to whether the district court correctly interpreted and applied the law. *State v. Wetzel*, 2005 MT 154, ¶ 10, 327 Mont. 413, ¶ 10, 114 P.3d 269, ¶ 10 (citing *State v. Martinez*, 2003 MT 65, ¶ 19, 314 Mont. 434, ¶ 19, 67 P.3d 207, ¶ 19).

¶21 *Expert witness testimony and admissibility of evidence*: We have repeatedly held that questions concerning the admissibility of evidence are within the discretion of the

7

district court. *Cottrell v. Burlington Northern R. Co.*, 261 Mont. 296, 301, 863 P.2d 381, 384 (1993); M. R. Evid. 104 (Rule 104). We review an evidentiary ruling regarding the admission of evidence of other crimes, wrongs, or acts for abuse of discretion. *State v. Marshall*, 2007 MT 198, ¶ 11, 338 Mont. 395, ¶ 11, 165 P.3d 1129, ¶ 11. We have also held that a district court is "vested with great latitude in ruling on the admissibility of expert testimony" and that "without a showing of an abuse of discretion, such [a] determination will not be disturbed." *Cottrell*, 261 Mont. at 301, 863 P.2d at 384; *State v. Crawford*, 2003 MT 118, ¶ 30, 315 Mont. 480, ¶ 30, 68 P.3d 848, ¶ 30; *State v. DuBray*, 2003 MT 255, ¶ 38, 317 Mont. 377, ¶ 38, 77 P.3d 247, ¶ 38; *State v. Larson*, 2004 MT 345, ¶ 29, 324 Mont. 310, ¶ 29, 103 P.3d 524, ¶ 29.

¶22 *Jury instructions*: We review jury instructions in a criminal case to determine whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. Further, we recognize that a district court has broad discretion when it instructs a jury, and we therefore review a district court's decision regarding jury instructions to determine whether the court abused that discretion. *State v. Swann*, 2007 MT 126, ¶ 32, 337 Mont. 326, ¶ 32, 160 P.3d 511, ¶ 32 (citations omitted). To determine whether a district court has abused its broad discretion, we determine "whether the trial court acted arbitrarily or exceeded the bounds of reason resulting in substantial injustice." *State v. English*, 2006 MT 177, ¶ 50, 333 Mont. 23, ¶ 50, 140 P.3d 454, ¶ 50. If the district court has rendered instructions that are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute a

reversible error. *State v. Archambault*, 2007 MT 26, ¶ 14, 336 Mont. 6, ¶ 14, 152 P.3d 698, ¶ 14.

¶23 *Conflicting evidence*: It is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court. We defer to the district court in cases involving conflicting testimony because we recognize that the court had the benefit of observing the demeanor of witnesses and rendering a determination of the credibility of those witnesses. *Wetzel*, ¶ 11 (citations omitted)**.**

## DISCUSSION

¶24 *Issue One: Did the District Court err when it denied Bieber's Motion to Suppress?*

¶25 Prior to trial, Bieber moved to suppress all evidence seized or acquired derivatively during the unannounced regulatory inspection conducted by DPHHS on February 14, 2003. She alleged that Hatfield intentionally misrepresented the purpose of his presence during the inspection. While acknowledging that she signed a consent form, she asserted that she believed she was required, as a condition of her day-care licensure, to submit to periodic unannounced inspections. She also claimed that Hatfield did not seek nor obtain her consent until after she, Johnson and Hatfield had walked through the entire day-care facility. She further argued that this was not a regulatory inspection but rather a warrantless criminal investigatory search. Bieber maintained that this pretextual search violated her due process rights and constituted an unreasonable search and seizure.

9

¶26    On April 12, 2005, the District Court held a hearing on Bieber's Motion to Suppress. In its detailed sixteen-page Findings of Fact, Conclusions of Law and Order, the court employed the "totality of the circumstances" test to determine whether Bieber's consent had been voluntary. It concluded that Bieber's consent had been voluntary and uncoerced. As a result, the District Court denied Bieber's motion to suppress the evidence obtained by Hatfield.

¶27    On appeal Bieber proffers numerous grounds upon which the District Court erred in refusing to suppress the evidence Hatfield collected including coerced consent, unjustified "plain view" seizure, and unreasonable warrantless administrative search of her business. Resolution of the suppression issue, however, is achieved through analysis of Bieber's consent; therefore, we need not address Bieber's other claims of error.

¶28    Bieber's substantive argument in her appellant's brief that her consent was involuntary consists of a single sentence: "While [Bieber] did sign a consent to search, it was based upon an intentional misrepresentation by law enforcement that it was for the purpose of allowing Agent Hatfield inspect [sic] and take photographs of the premises as part of a mandatory administrative inspection by DPHHS." Bieber's associated legal analysis is composed of a single citation to *State v. Carlson*, 198 Mont. 113, 644 P.2d 498 (1982), presented for the proposition that if an officer's statement constitutes subtle coercion, consent is invalid.

¶29    Under the Fourth and Fourteenth Amendments to the United States Constitution, and Article II, Section 11, of the Montana Constitution, warrantless searches and seizures are per se unreasonable subject only to a few carefully drawn exceptions. *State v.*

10

*Rushton*, 264 Mont. 248, 257, 870 P.2d 1355, 1361 (1994) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973)). One of the recognized exceptions to the warrant requirement arises when a citizen has knowledgeably and voluntarily consented to a search. *Rushton*, 264 Mont. at 257, 870 P.2d at 1361; § 46-5-101, MCA. The prosecution carries the burden of establishing that consent to a warrantless search was freely and voluntarily given and uncontaminated by any express or implied duress or coercion. *State v. Olson*, 2002 MT 211, ¶ 20, 311 Mont. 270, ¶ 20, 55 P.3d 935, ¶ 20.

¶30    Courts apply the "totality of the circumstances" test in determining whether consent has been voluntarily given and is uncontaminated by coercion or duress. *Wetzel*, ¶ 16. Thus, the determination of voluntariness of consent is dependent on the facts of each case, with no single fact being dispositive. *State v. Copelton*, 2006 MT 182, ¶ 19, 333 Mont. 91, ¶ 19, 140 P.3d 1074, ¶ 19 (citing *State v. Dawson*, 233 Mont. 345, 352, 761 P.2d 352, 356 (1988)).

¶31    The totality of the circumstances includes the defendant's age, experience, education level, the defendant's prior experience with the criminal justice system and police interrogation, whether the accused was advised of her Miranda rights, and whether the police used impermissible practices to extract incriminating statements from the defendant. *State v. Jones*, 2006 MT 209, ¶ 21, 333 Mont. 294, ¶ 21, 142 P.3d 851, ¶ 21. The court should consider any physical coercion, psychological coercion, deception, use of threats, and direct or implied promises when determining whether police employed impermissible practices to extract incriminating statements from the defendant. *Jones*, ¶ 21 (citation omitted).

¶32 The record indicates that Bieber was thirty-four years old at the time Johnson and Hatfield inspected Tiny Tots in February 2003. It also reveals that she graduated from high school in 1987 and immediately joined the Army where she undertook medical training after which she was assigned to an Army medical hospital. After leaving the Army, she underwent certified nursing assistant (CNA) training and worked as a CNA in Billings for five years. In 1998, she started Tiny Tots with a former partner who was subsequently replaced by Denise Smith.

¶33 Other relevant circumstances in this case included the DOJ consent form and the DOJ Miranda warning both signed by Bieber during Hatfield's inspection of the facility on February 14, 2003. The consent form stated in relevant part that she authorized Hatfield to conduct a complete search of her day-care center and authorized:

> [S]aid Agent to remove and search any letters, documents, papers, materials, containers, clothing, property or things which are considered pertinent to the investigation with the understanding that said Agent may seize and hold any and all items of evidence found provided said agent will provide me a receipt for whatever is removed.
>
> I have been advised of my constitutional right not to have a search made without a search warrant and of my right to refuse to consent to such a search. This consent is given freely and voluntarily without coercion or promises having been made or implied, is knowingly and intelligently given, and this consent is not obtained through deception or misrepresentation regarding the officer's authority or intention to secure a formal warrant.

¶34 Additionally, the record reveals that it was Hatfield's long-established custom to fully introduce himself when seeking consent to conduct an investigation. He testified that at or near the front door of Tiny Tots he identified himself, showed Bieber his badge and photograph identification and provided her with his business card. He explained that

12

he was conducting an investigation at the request of the Laurel Police Department into Dane's death and that he wanted to accompany Johnson in the day-care inspection. He instructed that he could not do so, however, without her consent. She agreed to sign the consent form. Johnson's testimony at the suppression hearing corroborated Hatfield's testimony.

¶35 Other circumstances pertinent to the voluntariness of Bieber's consent identified by the District Court and supported by the record include: Johnson and Hatfield arrived at Tiny Tots at approximately 10:30 a.m. on a weekday—a reasonable time to arrive at a place of business; they did not awaken Bieber who was calm, composed and appropriately dressed for her work day; she communicated appropriately and indicated that she fully understood the information Johnson and Hatfield were conveying and requesting; the children in her care during the inspection were not particularly demanding of her attention and during the inspection, Bieber's partner, Smith, arrived and took over supervision of the children for a short period of time; for several weeks prior to Hatfield's presence at Tiny Tots, Bieber had regular contact and cooperated with other law enforcement officers concerning Dane's death and had signed a prior consent form that was identical to the form she signed at Hatfield's request.

¶36 While Bieber disputes Hatfield's and Johnson's version of events, the District Court concluded that there was no credible evidence to support Bieber's contention that her consent was secured by subterfuge or express or implied misrepresentation. The court further concluded that Hatfield did not misrepresent his identity or purpose, nor did he engage in acts or communication tantamount to guise or pretext.

13

¶37 Bieber does not identify any specific District Court findings that she considers erroneous and our review of the record supports the court's findings and conclusions. As indicated above, it is not our function, on appeal, to reweigh conflicting evidence. We defer to the district court in cases in which conflicting testimony is presented because we recognize that the court had the benefit of observing the demeanor of witnesses and rendering a determination of the credibility of those witnesses. *Wetzel*, ¶ 11. We conclude that the District Court did not err in denying Bieber's motion to suppress.

¶38 *Issue Two: Did the District Court abuse its discretion in admitting the opinion testimony of the State's expert and in refusing to conduct a Daubert hearing?*

¶39 Bieber moved the District Court to preclude the State from presenting testimony by Dr. Philip Walson, the State's expert witness, that Dane died from DPH toxicity. Bieber criticized Walson's conclusions that Dane received a toxic and lethal overdose of DPH and that the unwarranted and unauthorized administration of the medicine exposed Dane to the risk of a serious or fatal outcome and constituted "endangerment." She argued that Walson's reliance on postmortem DPH blood levels to support his claim that Dane died from DPH toxicity was flawed because use of postmortem DPH blood levels to determine pre-mortem blood levels and declare cause of death constitutes a "novel application of pseudo-scientific speculations and conjecture." She requested that Walson's testimony be excluded or that a *Daubert*[2] hearing be held to determine admissibility under M. R. Evid. 702 (Rule 702). The District Court denied Bieber's motion.

---

[2] *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 583, 113 S. Ct. 2786, 2796-97 (1993).

¶40 On appeal, Bieber claims that the District Court committed reversible error when it refused to conduct a *Daubert* hearing. She asserts that Walson's letters explaining his conclusions dealt "only with [Walson's] opinions and beliefs about what he thinks the facts and circumstances of the alleged offense may be, and it does not deal with the appropriate subject matter for an expert opinion. In addition, the underlying methodology is not scientifically accepted and the toxicology test results were inherently unreliable." She continues that Walson's "opinion is based upon the perceptions of the State's investigators and reflective of the State's factual theory of the case." Lastly, she maintains that Walson's opinion does not meet any of the four standards for admission of expert scientific testimony set forth in *State v. Moore*, 268 Mont. 20, 885 P.2d 457 (1994) (overruled on other grounds by *State v. Gollehon*, 274 Mont. 116, 906 P.2d 697 (1995)).

¶41 The State responds that the District Court correctly determined that the subject matter required expert testimony which Walson was qualified to provide. It notes that district courts have "great" latitude in ruling on the admissibility of expert testimony and that without a showing of an abuse of discretion, such a determination should not be disturbed. In addition, it argues that *Daubert* does not apply because the testimony does not involve novel scientific evidence. The State posits that experts routinely offer testimony in the courts on the presence of drugs and their effects and that any questions regarding Walson's analysis go to the weight of the evidence, and not to its admissibility.

¶42 Bieber requested two *Daubert* hearings—one to address the coroner's report and a later one to address Walson's letters. On February 6, 2004, the District Court held a motions' hearing in which it allowed Bieber's expert to challenge the findings of the

15

coroner—i.e., that Dane's death was a homicide caused by a DPH overdose. On February 20, 2004, the District Court issued an order holding that Bieber's expert's testimony did not trigger a *Daubert* inquiry in that the "field of pathology [was] centuries old and is not a novel or speculative field . . . ." The court also determined that Bieber's expert was challenging the coroner's conclusion, and not the "principles or methodology or theory or technique of the science of pathology"; therefore, a *Daubert* hearing was unnecessary. Subsequently, after Walson submitted his opinion letters and Bieber changed attorneys, her new attorneys filed a second motion for a *Daubert* hearing to address Walson's testimony. The District Court scheduled the hearing but later vacated it concluding once again that Bieber was challenging Walson's conclusions and not his methodology and that vigorous cross-examination at trial would allow the jury to determine the sufficiency of the State's case.

¶43 Rule 702 governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

¶44 Bieber does not argue that Rule 702 expert testimony was unnecessary in this case; in fact, she asserts that such testimony was mandatory as a "lay jury is not able to determine whether or not a trace amount of an OTC drug constitutes a substantial risk of serious bodily injury or death," and presented three expert witnesses to the District Court to proffer support for her case. We agree that this is an appropriate case for expert testimony. *See State v. Nobach*, 2002 MT 91, ¶ 17, 309 Mont. 342, ¶ 17, 46 P.3d 618,

¶ 17, in which we held that the symptoms of drug consumption or the effect of drug consumption requires expert testimony. (Lay persons were not allowed to testify about common symptoms of drug consumption or the effects of drug consumption on a person's ability to drive.)

¶45    Nor does Bieber argue that Walson was unqualified to offer expert testimony or that the State failed to establish through foundation that Walson has the requisite training, education, knowledge or experience to testify as an expert. Rather, Bieber argues that Walson's opinion does not meet any of the four standards for admission of expert scientific testimony set forth in *Daubert* and *Moore* and that his opinion was based upon the perceptions of the State's investigators which is impermissible under *State v. Clark*, 209 Mont. 473, 682 P.2d 1339 (1984).

¶46    In *Daubert*, the U.S. Supreme Court established the following non-exclusive factors to be considered when assessing the reliability of proffered scientific expert testimony: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted or rejected in the particular scientific field. *Daubert*, 509 U.S. at 583, 113 S. Ct. at 2796-97.

¶47    In 1994, this Court adopted the *Daubert* factors, concluding they were consistent with our holding in *Barmeyer v. Montana Power Co.*, 202 Mont. 185, 657 P.2d 594 (1983), overruled on other grounds by *Martel v. Montana Power Co.*, 231 Mont. 96, 752

P.2d 140 (1988), concerning the admission of novel scientific evidence. *Moore*, 268 Mont. at 42, 885 P.2d at 470-71. While Bieber argues otherwise, this Court has consistently held since *Moore* that the *Daubert* factors apply exclusively to *novel* scientific evidence. *State v. Cline*, 275 Mont. 46, 55, 909 P.2d 1171, 1177 (1996); *Hulse v. State, Dept. of Justice*, 1998 MT 108, ¶¶ 55-69, 289 Mont. 1, ¶¶ 55-69, 961 P.2d 75, ¶¶ 55-69; *State v. Southern*, 1999 MT 94, ¶ 59, 294 Mont. 225, ¶ 59, 980 P.2d 3, ¶ 59; *Gilkey v. Schweitzer*, 1999 MT 188, ¶¶ 18-20, 295 Mont. 345, ¶¶ 18-20, 983 P.2d 869, ¶¶ 18-20; *State v. Hocevar*, 2000 MT 157, ¶ 56, 300 Mont. 167, ¶ 56, 7 P.3d 329, ¶ 56; *State v. Ayers*, 2003 MT 114, ¶ 37, 315 Mont. 395, ¶ 37, 68 P.3d 768, ¶ 37.

¶48   In *Moore*, the defendant argued that the district court erred in admitting DNA evidence. Although the foundation of the testimony of the State's expert witnesses was somewhat shaky, we concluded the district court did not err in ruling that the defendant's objections to the DNA evidence went to the weight of the evidence and not to its admissibility. *Moore*, 268 Mont. at 42-43, 885 P.2d at 471**.**

¶49   In the case before us, Bieber argues that she is not challenging the area of forensic toxicology but rather "the novelty of the extension of accepted pathological and toxicological standards which render it 'novel science' as applied to this case." As did the District Court, we conclude this is a challenge to the conclusions reached by the State's expert witness, rather than a challenge to the methodology used to determine the level of DPH in Dane's body or to the scientific research chronicling DPH-related deaths in small children. As Bieber was not challenging the methodology or technique of the science underlying the expert's testimony, the District Court did not abuse its discretion

18

by denying Bieber's request for a *Daubert* hearing while encouraging vigorous cross-examination before the jury.

¶50    As for Bieber's claim that Walson's testimony was inadmissible under *Clark*, *Clark* is distinguishable.  In *Clark*, we held that under Rule 702 a private investigator could not testify as an expert as to the results of his investigation as such testimony would not involve "scientific, technical or other specialized knowledge" but rather was a summary of alibi evidence gathered from interviewing people regarding the crimes for which Clark was charged.  *Clark,* 209 Mont. at 485, 682 P.2d at 1345.  In the case at bar, Walson's expert testimony was premised upon his review of medical records, police reports, MEDLINE research on results for DPH and adverse effects, forensic and autopsy reports, and other articles identifying DPH toxicity concerns.  Walson concluded based upon the medical history of the child, the postmortem DPH levels, the placement of the child on his stomach, and the absence of adequate observation, that Dane stopped breathing enough to keep his oxygen level up and because he was sedated, he did not respond appropriately.  As a result, his oxygen continued to fall until he eventually stopped breathing completely and his heart stopped.  This testimony, unlike that of the investigator in *Clark*, was not based exclusively upon a factual review of the statements of witnesses but rather was developed through review of scientific and medical records, articles and reports.  As such, it was within the realm of admissible expert testimony.  Therefore, we conclude that the District Court did not abuse its discretion in admitting Walson's testimony.

¶51   *Issue Three: Did the District Court abuse its discretion in admitting M. R. Evid. 404(b) (Rule 404(b)) evidence of "other acts" and refusing offered cautionary instructions?*

¶52   Over Bieber's objections, the District Court allowed the State to present evidence that Bieber had purchased sixty-three 12-ounce bottles of DPH from Costco during the two years before Dane's death: forty-five bottles were purchased within a year of his death and six bottles were purchased within a month of his death. The evidence showed that Bieber made the majority of these purchases using day-care funds. Additionally, the State offered evidence that Bieber violated administrative rules pertaining to the use of drugs at the day-care. This evidence included testimony by parents testifying that they did not give Bieber or other day-care staff written permission to administer OTC drugs to their children.

¶53   Bieber claims that this evidence was inadmissible because it was irrelevant and highly prejudicial. She also claims that it was inadmissible under Rule 404(b) without a State-articulated permissible purpose for introducing the evidence and a *Just* notice as required by *State v. Just,* 184 Mont. 262, 602 P.2d 957 (1979), *modified*, *State v. Matt,* 249 Mont. 136, 814 P.2d 52 (1991). Moreover, Bieber asserts that the District Court abused its discretion by refusing to give a cautionary instruction offered by her.

¶54   The State counters that Rule 404(b) is inapplicable because it pertains to "character" evidence and evidence of Bieber's DPH purchases was not introduced to inform the jury as to Bieber's character. Furthermore, the State maintains, evidence of DPH purchases are not "wrongful acts" under Rule 404(b); rather, such evidence, together with testimony that the parents did not provide written permission to administer

OTC medications to their children, was relevant and admissible evidence under the "transaction rule" in that it was inextricably linked to the crimes charged. Under the transaction rule, a declaration, act, or omission that forms a part of a transaction which is itself the fact in dispute or evidence of that fact, is admissible. Section 26-1-103, MCA.

¶55   Rule 404(b), provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶56   In *Just*, the Court noted that Montana protects a defendant in certain circumstances against "the admission of potentially prejudicial evidence of other crimes or wrongful acts. It is the rule that both trial courts and this Court are obligated to balance carefully the relative probative value of the evidence of other offenses against the prejudice inherent in this type of evidence in light of the actual need to introduce such evidence." As a safeguard we require that evidence of other crimes may not be received unless proper notice has been provided to the defendant of the State's intent to use such evidence and the State has indicated the purpose for which the evidence will be introduced. *Just*, 184 Mont. at 268, 602 P.2d at 960-61.

¶57   It is undisputed that the State did not provide notice under the Modified *Just* Rule, nor did it articulate the purpose for which it intended to introduce the evidence. However, under the transaction rule and *Marshall*, neither was necessary. In *Marshall*, Marshall was convicted of attempted sexual abuse of children and indecent exposure. The State introduced evidence of sexual comments and sexually provocative acts

21

Marshall made toward the children in the months prior to his arrest. Marshall challenged the introduction of the prior acts on the grounds that the State did not provide the required notice or a permissible purpose for its introduction. We held the District Court did not abuse its discretion in admitting this evidence. We explained that under § 26-1-103, MCA, the comments and acts were part of a continuous course of conduct in which Marshall was "grooming" the girls for future unlawful sexual activity. We determined that under the transaction rule, these acts were inextricably linked to the offense charged and therefore were admissible and not subject to the four-prong test or the notice requirements under *Just* or *Matt* criteria. The same analysis applies in the case before us. Bieber's purchases of DPH during the months before Dane's death, while not illegal acts, are nonetheless "inextricably linked to, and explanatory of, the charged offense" and are admissible notwithstanding the rules relating to "other acts" evidence. *Marshall*, ¶ 16; *State v. Gillham*, 206 Mont. 169, 178-79, 670 P.2d 544, 549-50 (1983) (evidence that Gillham possessed the weapon and material used in the attempted deliberate homicide constituted evidence that was closely related to the offense and explanatory of it).

¶58 Having determined that the evidence of DPH purchases was not subject to the Modified *Just* Rule or *Just* notice, it must be analyzed, not in terms of Rule 404(b), M. R. Evid., but in terms of relevancy. In general, under Rule 402, M. R. Evid., relevant evidence is admissible. Rule 401, M. R. Evid., defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Accord State v. Rendon*, 273 Mont. 303, 307, 903 P.2d 183, 185-86 (1995).

Evidence of numerous and long-term purchases of DPH with day-care funds was relevant to the questions of whether Bieber caused Dane's death or endangered other children by administering DPH to them.

¶59 Bieber also argues that the evidence was highly prejudicial and therefore should have been excluded. Relevant evidence is excluded only if its probative value is substantially outweighed by the danger of "unfair prejudice." Rule 402, M. R. Evid.; *State v. Cesnik*, 2005 MT 257, ¶ 16, 329 Mont. 63, ¶ 16, 122 P.3d 456, ¶ 16. It is within the district court's discretion to balance the probative value of the evidence against its unfair prejudice. *State v. Devlin*, 251 Mont. 278, 283, 825 P.2d 185, 188 (1991). Unfair prejudice can arise from evidence that arouses the jury's hostility or sympathy for one side without regard to its probative value, evidence that confuses or misleads the trier of fact, or evidence that might unduly distract the jury from the main issues. *State v. Huether*, 284 Mont. 259, 265, 943 P.2d 1291, 1295 (1997). In criminal proceedings, probative evidence is often, if not always, prejudicial to the defendant. *State v. Pittman*, 2005 MT 70, ¶ 27, 326 Mont. 324, ¶ 27, 109 P.3d 237, ¶ 27. We conclude that the frequent purchases of the medication found in Dane's body and the bodily fluids of two other children attending the day-care was probative evidence, and conclude the District Court did not err in admitting it.

¶60 Finally, Bieber complains that evidence of DPHHS violations was inadmissible. We disagree and hold that this evidence too was admissible under the transaction rule. Therefore, the District Court did not abuse its discretion in admitting the evidence. We further conclude that no cautionary jury instruction to cure prejudice was required.

23

¶61 *Issue Four*: *Did the District Court abuse its discretion in refusing offered defense jury instructions?*

¶62 Bieber claims that the District Court abused its discretion in refusing to instruct the jury on defense theories she believed applicable to her case and supported by the evidence. The theories on which she offered instructions included: (1) mental state and definition of criminal negligence; (2) accident, misfortune and foreseeability; (3) good faith belief defense; and (4) prejudicial joinder of offensive [sic] and cumulative consideration of evidence. The State counters that Bieber's proposed instructions were cumulative, confusing, or inappropriate based on Bieber's defense position. The State also argues that some of Bieber's proposed instructions relied on inapposite law or were inaccurate summaries of the statutes offered as authority.

¶63 As noted above, and recently addressed in *Archambault*, district courts are accorded broad discretion in formulating jury instructions. This broad discretion is reflected in various rules developed over the years, including the following: (1) while district courts must instruct the jury on each theory which is supported by the record, the defendant is not entitled to have the jury instructed on every nuance of his or her theory of the case; (2) the fact that one instruction, standing alone, was not as complete or accurate as it could have been is not reversible error; and (3) district courts may refuse to give a requested instruction if its contents are adequately covered by the given instructions—i.e., it is not necessary to give repetitive instructions. Yet, while the district courts' discretion is broad, it is ultimately restricted by the overriding principle that jury

24

instructions must fully and fairly instruct the jury regarding the applicable law. *Archambault*, ¶ 25 (internal citations omitted).

¶64     Based on our review of the instructions given to the jury, and applying this deferential standard of review, we conclude that as a whole, the instructions given to the jury by the District Court fully and fairly instructed the jury on the law that was applicable to the case; therefore, the District Court did not abuse its discretion in refusing to give Bieber's proposed instructions.

¶65     *Issue Five:  Did the District Court abuse its discretion in failing to instruct the jury in response to jury questions and in subsequently providing an Allen-type instruction after the jury was deadlocked?*

¶66     On the second day of jury deliberations, the jury informed the District Court, in writing, that it had reached verdicts on counts two, three and four but that it "appeared" to be deadlocked on counts one and five.  The foreperson requested assistance on the definition of "reasonable doubt" as it related to cause of death and indicated that "it [was his] opinion alone that we do not have adequate information to arrive at an agreement." Bieber moved for a mistrial which the court denied. Bieber subsequently proposed a supplemental instruction which was refused by the court.  Instead, the District Court judge responded in writing: "I cannot give you more assistance.  The law has been given to you in the 32 instructions."  After further deliberations, the jury notified the court that it could not reach verdicts on counts one and five.  Bieber again moved for a mistrial which was again denied.  The District Court then brought the jury back into the courtroom and without inquiry or discussion read a cautionary instruction for a potentially hung jury the source of which is Montana Criminal Jury Instruction (MCJI)

25

1-022. The jury returned to deliberations and ultimately convicted Bieber on counts one, three and four and acquitted her on counts two and five.

¶67    Bieber claims the court's refusal to offer her proposed supplemental jury instruction on "reasonable doubt" constitutes error.  As noted above, we review a court's jury instructions in a criminal case to determine whether, as a whole, they fully and fairly instruct the jury on the law applicable to the case.  Moreover, we apply the same standard of review to a court's decision to provide or deny the jury's request for additional information pursuant to § 46-16-503, MCA.  When a court fully and correctly instructs the jury as to a defendant's legal duties at issue, it is not an abuse of discretion to refuse to further instruct the jury.  *State v. Crawford*, 2002 MT 117, ¶ 15, 310 Mont. 19, ¶ 15, 48 P.3d 706, ¶ 15.  As previously indicated, we conclude that as a whole, the instructions given to the jury by the District Court fully and fairly instructed the jury on the law applicable to the case.  Therefore, the court did not abuse its discretion by refusing to provide further instruction.

¶68    Bieber also maintains that the District Court erred in giving an "*Allen*-type" instruction after learning that the jury was deadlocked with a single holdout juror.  The term "*Allen* charge" is the generic name for a class of supplemental jury instructions given when jurors are apparently deadlocked; the name derives from the first Supreme Court approval of such an instruction in *Allen v. United States*, 164 U.S. 492, 501-02, 17 S. Ct. 154 (1896).  In its mildest form, such an instruction reminds jurors of the importance of securing a verdict and asks jurors to reconsider potentially unreasonable positions.  In its stronger form, an *Allen* charge has been referred to as a "dynamite

26

charge" because of its ability to "blast" a verdict out of a deadlocked jury. "In the archetypal *Allen* charge context, the judge instructs a deadlocked jury to strive for a unanimous verdict." *U.S. v. Berger,* 473 F.3d 1080 (9th Cir. 2007) (internal citations omitted).

¶69 This Court addressed an *Allen* instruction for the first time in *State v. Randall*, 137 Mont. 534, 540-42, 353 P.2d 1054, 1057-58 (1960). In *Randall*, the jury informed the district court that it was unable to reach a verdict. The court therefore read a lengthy instruction to the jury, most of which was unobjectionable. However, part of the instruction contained language that this Court determined was coercive in that it singled out dissenting jurors who disagreed with the majority and asked them to reconsider their views for the purpose of reaching a unanimous verdict. We held in *Randall*:

> The inevitable effect of the instruction would be to suggest to the minority members of the jury that they ought to surrender their own convictions and follow the majority. A vibrant, pulsating, intelligent minority is a part of our American way of life. The views of the minority often, with the passage of time, become the majority view . . . . The majority view on any given subject is not always the correct view.

*Randall*, 137 Mont. at 542, 353 P.2d at 1058.

¶70 We revisited this issue in *State v. Cline*, 170 Mont. 520, 555 P.2d 724 (1976). In *Cline*, we concluded that the instruction given by the district court to a potentially deadlocked jury was not of the coercive character of that given in *Randall*. Rather, we found the instruction at issue innocuous, and concluded it did not unduly single out or pressure a dissenting juror. *Cline*, 170 Mont. at 540, 555 P.2d at 736. With very minor changes, the instruction given in this case was identical to the instruction we approved in

27

*Cline*. For the same reasons we concluded that the instruction in *Cline* was acceptable, we conclude that the instruction given here was not objectionably coercive. This being so, we reject Bieber's contention that the District Court was attempting by way of its instruction to coerce and intimidate the lone juror ostensibly creating the deadlock.

¶71   *Issue Six*: *Is reversal for cumulative error required?*

¶72   Having determined that the District Court's rulings were neither erroneous nor an abuse of discretion, no cumulative error warranting reversal occurred.

## CONCLUSION

¶73   For the foregoing reasons, we affirm the District Court.


/S/ PATRICIA COTTER


We Concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS



Justice James C. Nelson concurs.

¶74   I concur in the Court's Opinion. With respect to our discussion at Issue Two, and Bieber's argument that a *Daubert* hearing is required when the evidence offered involves "novel" scientific evidence, I note only that I continue to disagree with our jurisprudence that limits the application of *Daubert* to that type of evidence. *See State v. Clifford*, 2005 MT 219, ¶¶ 60-91, 328 Mont. 300, ¶¶ 60-91, 121 P.3d 489, ¶¶ 60-91 (Nelson, J.,

concurring).  On the facts here, however, and even if our *Daubert* jurisprudence were not so constrained, I conclude that the result would not have been any different.

¶75    I concur.

/S/ JAMES C. NELSON