No. 05-080

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 105

STATE OF MONTANA,

Plaintiff and Respondent,

v.

APRIL STOMBAUGH,

Defendant and Appellant.

APPEAL FROM:    The District Court of the Fifth Judicial District,
In and For the County of Jefferson, Cause No. DC 04-1938,
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jack H. Morris, Jardine & Morris, Whitehall, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

Mathew J. Johnson, County Attorney, Boulder, Montana

Submitted on Briefs:  May 10, 2006

Decided:  May 1, 2007

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant April Stoumbaugh (April) appeals from the order of the Fifth Judicial District Court, Jefferson County, denying her motion to suppress. We affirm.

¶2     We consider the following issues on appeal:

¶3     (1) Did particularized suspicion exist to support a canine sniff of April's vehicle?

¶4     (2) Did the District Court err by denying April's motion to suppress statements she made to law enforcement on the grounds that she had not been given *Miranda* warnings and, further, had requested an attorney?

¶5     (3) Was the search warrant issued for April's vehicle supported by probable cause?

## BACKGROUND

¶6     On April 7, 2004, April called her aunt and uncle, Anna and Vonn Friddle, to advise that she was coming to visit them in Boulder. Vonn and Anna had prior knowledge of April's involvement with drugs and were concerned that she was going to be on drugs or bring drugs with her to their home. Vonn knew from April's mother that April had outstanding warrants for her arrest in Montana. According to her mother, April was also facing felony charges in Washington. Vonn called April's mother to get more information and spoke with April's stepfather. In the course of the conversation, the stepfather commented that he wished law enforcement would "just lock [April] up to get her the help she needs." Vonn offered to let law enforcement know that April was at his house so an officer could arrest her on her outstanding warrants. After April's stepfather endorsed this suggestion, Vonn called his brother, Ronnie Hayes (Hayes), who is a

2

dispatcher at the Boulder Police Department. In response to the call, Hayes confirmed that April had outstanding arrest warrants and arranged for an officer to arrest her.

¶7     Shortly thereafter, April arrived at the Friddles' house. Officer Kosola (Kosola), of the Boulder Police Department, was dispatched to the Friddles' home to arrest April on the outstanding warrants. When Kosola arrived he saw a vehicle with Washington license plates parked behind Vonn's car. Kosola knocked on the door of the residence, and Anna let him inside. He informed April of the outstanding warrants and placed her under arrest. Kosola handcuffed April, checked for weapons, and informed her of her *Miranda* rights.[1]

¶8     After Kosola arrested April, she expressed her concern to him that she would not be able to make a timely appearance in Spokane, Washington, to face drug charges. Kosola confirmed April's statements by contacting the local authorities in Spokane and verifying through the Criminal Justice Information Network (CJIN) that she had felony drug charges pending in Washington.[2]

¶9     Shortly after Kosola arrested April, Deputy Smoke (Smoke) of the Jefferson County Sheriff's Office arrived at the Friddles' residence. While Kosola was transporting April to the police station, Smoke stayed and spoke with the Friddles. Both

---

[1]Testimony from Kosola and Anna indicated that Kosola gave April a *Miranda* warning at the Friddle residence, following her arrest. April contested this testimony. In its oral findings, the District Court did not address the conflict over this specific *Miranda* warning, instead finding generally that "the more credible evidence is that the Defendant was given her *Miranda* rights on more than one occasion over the course of the day."

[2]In addition to the Washington drug charges, the CJIN report indicated that April had seven outstanding Montana misdemeanor warrants, but testimony indicated that a number of these were later found to be expired or invalid.

Vonn and Anna told Smoke that April had a drug problem, and they were very concerned about her. The Friddles also informed Smoke that they wanted April's car, which was parked behind their car, removed from their property. Smoke radioed Kosola to inform him of this and also reported that he had observed that the vehicle's ignition was "punched"—a common indicator that the vehicle was stolen. Kosola ran a registration check and asked April about the vehicle. April explained that she bought the car from a woman in Washington State, and had a bill of sale in the glove box. April agreed to a limited search of the glove box and a door panel of the car to collect the ownership documentation, which Kosola conveyed to Smoke.

¶10 Kosola also advised April that the Friddles wanted her car removed, and April responded by advising Kosola that she wanted her car towed to her mother's house in Lewis and Clark County. Kosola found April's response "demanding" and given with an urgent sense of wanting the car towed immediately. He advised April that Montana City Towing could tow it to that establishment's property much cheaper than towing it to the Lewis and Clark County location, and further suggested that the fee for towing the car that far could well exceed the value of the vehicle, which Kosola estimated to be $150. However, April insisted on doing so, which Kosola found to be unusual and suspicious. A tow truck was dispatched but, upon arriving at the scene, the tow truck operator was advised to wait, because by then additional events had occurred and police had decided to initiate a canine sniff, as discussed below. Ultimately, April's mother declined to pay the cost of having the car towed to her residence, and the vehicle was impounded.

4

¶11 Smoke searched the glove box and obtained the bill of sale and title documents. On a first look, it appeared to Smoke that the seller's signatures on the bill of sale and on the registration did not match, raising a concern that different people had signed the seller's name.[3] While completing that limited search, Smoke noticed a white pill in plain view on the dashboard, which he could not identify, but which had numbers imprinted thereon. Smoke advised Kosola about the pill and relayed the imprinted numbers. Kosola asked April about the pill and, according to Kosola, April answered evasively, which Kosola thought suspicious. He testified regarding the pill as follows:

Q. So this pill at the time, until it's verified what it is, it would be suspicious to you?

A. Yes.

Q. And why would that be?

A. It could be Oxycontin; it could have been anything. I don't know what kind of pill it was. Unknown pill.

Q. And somebody who has had a drug history, right?

A. Yes. They're looking for an easy fix.

¶12 Smoke testified as follows:

Q. At that time, you had background information that . . . the potential owner had some drug history; is that correct?

A. Yes.

Q. So when seeing the pill, did that raise any suspicion for you?

---

[3]April's ownership of the vehicle was ultimately verified by police, and the District Court concluded it would not consider the vehicle issues in determining the existence of particularized suspicion or probable cause herein.

A. That did. I looked through the windshield at the pill, and was able to obtain the numbers off of the side facing up . . . .

Q. When seeing a pill and seeing numbers on it, would that alleviate any suspicion that it could be illegal narcotics?

A. No, it would not, because it could be a prescription drug belonging to somebody else, because obviously it wasn't in the prescription container; or it could be a controlled narcotics or something like that.

¶13 Based on what had transpired, Kosola requested that Deputy Grimsrud (Grimsrud) of the Jefferson County Sheriff's Office bring his narcotics detection dog to conduct a canine sniff of April's vehicle. The dog "hit" or alerted to the odor of drugs on the vehicle. Kosola informed April that the narcotics dog had alerted to her vehicle and again gave her a *Miranda* warning from a printed advisory card. April then indicated that there was drug paraphernalia in the vehicle, and Kosola asked her for permission to search the vehicle. Kosola testified that April was then "fidgety," but gave a second limited consent to search the vehicle, specifying that police search only the vehicle's console, within which a marijuana pipe would be found in a silver box. This was found in the later search. Kosola testified that he drew suspicions from the limiting conditions April had placed on both the first and second consents to search.

¶14 Kosola then contacted his superior, the chief of police, and the county attorney, and followed their direction to apply for a search warrant and impound the vehicle. The warrant application referenced some, but not all, of the above-described events. Upon receiving the warrant, Kosola executed the search, finding marijuana pipes and drug paraphernalia in the trunk with marijuana and methamphetamine residue on them.

¶15 April filed a motion to suppress the evidence, which was denied. April appeals.

## STANDARD OF REVIEW

¶16 This Court reviews a district court's grant or denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Ochadleus*, 2005 MT 88, ¶ 16, 326 Mont. 441, ¶ 16, 110 P.3d 448, ¶ 16 (citation omitted).

## DISCUSSION

**¶17 1. Did particularized suspicion exist to support a canine sniff of April's vehicle?**

¶18 April argues that the District Court's denial of her motion to suppress evidence should be reversed because there was insufficient objective data to constitute the necessary particularized suspicion for police to initiate a canine sniff with the narcotics detection dog. The law allows "for a carefully drawn exception to the warrant requirement, but still require[s] particularized suspicion when the area or object subject to the canine sniff is already exposed to the public." *State v. Tackitt*, 2003 MT 81, ¶ 29, 315 Mont. 59, ¶ 29, 67 P.3d 295, ¶ 29. To establish particularized suspicion, the State must show: (1) objective data from which an experienced police officer can make certain inferences; and (2) a resulting suspicion that the person is or has been engaged in wrongdoing or was a witness to criminal activity. *State v. Gopher*, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981). Whether the State has particularized suspicion is a question of fact that is analyzed under the totality of the circumstances. *State v. Pratt,* 286 Mont. 156, 161, 951 P.2d 37, 40 (1997). In evaluating the totality of the circumstances, a court

7

should consider the quantity, or content, and quality, or degree of reliability, of the information available to the officer. *Pratt*, 286 Mont. at 161, 951 P.2d at 40.

¶19 April challenges the particularized suspicion determination, first, by noting that the initial concerns regarding her car's ownership were alleviated. She argues that her family's concerns about her drug use were unfounded and uncorroborated, and that there was no evidence that the white pill was contraband. Lastly, April argues that the suspicions taken by Kosola from the limited consent to search she gave are unfounded because such limitation "is not objective evidence" and she retained her constitutional right of privacy in the remaining portions of her vehicle.

¶20 On this last point, the District Court agreed with April, concluding that a limitation on permission to search cannot be considered for purposes of determining particularized suspicion. Thus, it disregarded the limitation placed upon the search by April in analyzing particularized suspicion, and we do likewise.

¶21 The State responds that after Kosola's contact with April was lawfully initiated pursuant to her arrest on outstanding warrants, officers properly relied on April's family's concerns about her drug use because Kosola knew the family was concerned enough to disclose April's location, in their own home, so that law enforcement could arrest her there. Then, April herself advised Kosola of her pending drug charges in Washington and expressed her concerns about being able to timely appear to answer those charges. The District Court relied upon these factors and also noted Kosola's efforts to confirm the charges.

8

¶22 As for the white pill, the State contends that it was proper, in light of April's own admission to pending drug charges, to consider it as possible contraband even though it was not immediately identifiable as such. In its discussion about the white pill, the District Court noted that the pill was "a concern," but not very significant. The District Court did find that April's "evasive attitude" in response to questioning by Kosola was a significant factor supporting particularized suspicion.

¶23 The District Court identified April's "urgency" in seeking to arrange the towing of her vehicle to Lewis and Clark County, and her willingness to pay more than the car was worth for towing, as a consideration in its probable cause analysis, also made from the bench, but did not do so in its discussion of particularized suspicion. This may result from the mention of this urgency in Kosola's application for issuance of a search warrant. However, the testimony illustrates that Kosola's suspicions in this regard were also raised prior to his decision to seek the canine sniff. A tow truck had been called out to tow the vehicle, but the towing was delayed when Kosola, having thereafter been notified of Smoke's discovery of the white pill and hearing April's evasive answers with regard to the pill, determined to initiate a canine sniff of the vehicle.

¶24 On these facts—the family report about April's drug use and notification of April's location in their home, April's admission of pending drug charges in Washington, police confirmation of pending felony drug charges, April's urgency in seeking removal of her vehicle out of the county and her unusual desire to pay more than the car was worth to do so, the discovery of the white pill and April's evasiveness about the pill—we

conclude that the District Court did not err in holding that the officers had particularized suspicion to conduct the canine sniff of April's vehicle.

**¶25    2.    Did the District Court err by denying April's motion to suppress statements she made to law enforcement on the grounds that she had not been given *Miranda* warnings and, further, had requested an attorney?**

¶26    April argues that she was not given her *Miranda* warnings as required by law, and thus the District Court's denial of the motion to suppress evidence should be reversed. April contends that she made a request for an attorney that was unambiguous and she never waived her *Miranda* rights. The State argues that the District Court's finding that Kosola read April the *Miranda* warnings is not clearly erroneous and that the court correctly resolved any factual disputes in the testimony.

¶27    At the suppression hearing, April testified that she could not recall Kosola reading her *Miranda* rights. Kosola, however, testified he was certain that as soon as he placed April under arrest, he took a card from his pocket containing the *Miranda* warning, and read it to April. April's aunt, Anna Friddle, corroborated Kosola's testimony that the warning had been given at her house. The District Court resolved this conflicting evidence by finding that April had been advised of her *Miranda* rights.

¶28    This Court recognizes that the credibility of witnesses and the weight to be given their testimony are determined by the trier of fact, and disputed questions of fact and credibility will not be disturbed on appeal. *State v. Bauer*, 2002 MT 7, ¶ 15, 308 Mont. 99, ¶ 15, 39 P.3d 689, ¶ 15. If evidence conflicts, it is within the province of the trier of fact to determine which will prevail. *Bauer*, ¶ 15. Here, the District Court assessed the

10

credibility of the witnesses and found that Kosola gave *Miranda* warnings to April. We conclude that this finding was not clearly erroneous.

¶29 April also testified that she asked for an attorney after being advised by Kosola that the drug dog had alerted to her car. This assertion was contested by Kosola, who testified that April did not request an attorney. Unfortunately, the District Court did not make a finding on this particular conflict in the testimony. In its verbal findings on these issues, the District Court stated as follows:

> The Court finds and concludes that the more credible evidence is that the Defendant was given her Miranda rights on more than one occasion over the course of the day. Thereafter she volunteered the admission and the existence of drug paraphernalia within the vehicle which was to be searched . . . .

¶30 We can only conclude from the District Court's finding that April "volunteered" the information about drug paraphernalia in her car, that she was not also asking for an attorney. April's statement about the paraphernalia was made after Kosola advised her about the drug dog hit—the same time which April claimed to have asked for an attorney. The District Court found that, at that time, April was volunteering information about the drug paraphernalia, which would be inconsistent with a request for legal assistance. We thus conclude that April's *Miranda* claims were properly denied by the District Court.

¶**31** We note, however, that this factual issue, along with other issues addressed in this opinion, demonstrates that a district court's rendering of findings of fact and conclusions of law from the bench can quite easily be inadequate. Without careful drafting, issues can be overlooked and a decision issued which is insufficient for appellate review,

11

resulting in remand. We urge the district courts to resolve factual and legal issues regarding suppression by way of a written order.

**¶32   3. Was the search warrant issued for April's vehicle supported by probable cause?**

¶33   April argues that the search warrant obtained by the officers was not supported by probable cause. The United States and Montana Constitutions protect individuals from unreasonable searches and seizures. Amend. IV, U.S. Const.; Art. II, Sec. 11, Mont. Const. For a search warrant to issue, the application must state facts sufficient to show probable cause. *State v. Olson*, 2003 MT 61, ¶ 24, 314 Mont. 402, ¶ 24, 66 P.3d 297, ¶ 24.

¶34   Probable cause to search exists "if the facts and circumstances within the officer's personal knowledge . . . are sufficient to warrant a reasonable person to believe that the suspect has committed an offense." *State v. Saxton*, 2003 MT 105, ¶ 26, 315 Mont. 315, ¶ 26, 68 P.3d 721, ¶ 26. Probable cause is evaluated in light of an officer's knowledge and all relevant circumstances. *State v. Van Dort*, 2003 MT 104, ¶ 19, 315 Mont. 303, ¶ 19, 68 P.3d 728, ¶ 19.

¶35   April raises arguments similar to those she offered above against the factors considered for determining the existence of particularized suspicion, and also contends that her statements to the police should be excised from the warrant application because she asked for an attorney, an issue likewise addressed above. Because we have already rejected April's *Miranda* claims, we do not excise any information from the warrant application.

12

¶36 In addition to the factors considered for particularized suspicion, except for the white pill, which was not referenced within the warrant application, Kosola's application also described the alert of the drug dog on April's vehicle, her admission thereafter that drug paraphernalia was located within the vehicle, and the officers' experience and qualifications with regard to drug crime investigation. We have previously concluded that probable cause for a search existed under similar circumstances. *See State v. Hart*, 2004 MT 51, ¶ 27, 320 Mont. 154, ¶ 27, 85 P.3d 1275, ¶ 27. Likewise, we hold that the District Court correctly concluded that probable cause existed for the issuance of the search warrant herein.

¶37 Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART

13