DA 06-0001

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 55

STATE OF MONTANA,

      Plaintiff and Appellee,

  v

BRANDEN DALE GITTENS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDC-04-392
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Matthew T. McKittrick, Cascade County Public Defender, Great Falls,
Montana

      For Appellee:

            Hon. Mike McGrath, Montana Attorney General, Joslyn M. Hunt,
Assistant Attorney General, Helena, Montana

            Brant Light, Cascade County Attorney, Joel Thompson, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs: November 9, 2006

Decided: February 15, 2008

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Branden Dale Gittens was convicted in the District Court for the Eighth Judicial District, Cascade County, of one felony count of criminal possession of dangerous drugs with intent to distribute and one misdemeanor count of criminal possession of drug paraphernalia. He appeals from these convictions and from the denial of his motion to suppress. We affirm.

¶2 The issues on appeal are as follows:

1. Did the District Court err in denying Gittens' motion to suppress statements, based on the State's alleged failure to show that Gittens was properly Mirandized?

2. Did the District Court err in admitting testimony that Gittens claimed was inadmissible evidence of other crimes, wrongs, or acts under M. R. Evid. 404(b)?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On September 24, 2004, Cascade County Sheriff's Deputy Thomas Dalton made a traffic stop in Black Eagle, Montana. Dalton requested backup and Deputy Engelberto Ruiz arrived on the scene. The driver stated that he was going to Gittens' house. Dalton was aware that Gittens had warrants issued for him in the past, so Dalton ran a warrant check. After discovering that Gittens had active county warrants for his arrest, Dalton and Ruiz allowed the driver to proceed, and they followed the vehicle to Gittens' residence. While Ruiz went to the front door of the house, Dalton made contact with Gittens outside the back door of the house. Dalton advised Gittens that there was a warrant out for his arrest, and Dalton then placed Gittens under arrest.

2

¶4 Dalton could smell the odor of burning marijuana coming from Gittens' person. Dalton requested and received permission from Gittens to search the house. Two other individuals, Richard Aguon and Alex Smithson, were also present in the house, although Smithson left soon after. Ruiz went to search the basement and discovered a 316.4-gram brick of marijuana encased in a cooler. Ruiz also located a number of bongs, marijuana pipes, plastic baggies, a scale, several issues of "High Times" magazine, and other assorted drug paraphernalia. Three of these items bore the words "B Dogg," which was Gittens' nickname. After discovering the brick of marijuana, Ruiz notified Dalton, and Dalton came down to the basement along with Gittens. Dalton observed that Gittens started to shake and appeared visibly upset after seeing what Ruiz had discovered. Upon searching the remainder of the house, Ruiz discovered additional drug paraphernalia in Gittens' bedroom and a "party hookah"[1] inside a box in the living room.

¶5 Dalton contacted the shift supervisor, Sergeant Scott Van Dyken, who arrived a short while later. Van Dyken recommended that Dalton bring Gittens out of the house to videotape Dalton's reading of Gittens' *Miranda* rights and to memorialize that Gittens had consented to the search of his house. Dalton then took Gittens outside to the patrol car to read him his rights. The patrol car had an on-board video camera with audio recording capabilities; however, as Dalton later explained, due to technical difficulties, the microphone did not pick up the conversation. In regard to the video, Gittens asserted in his motion to suppress that "the videotape does not adequately show the face of the

---

[1] Ruiz described the "party hookah" as a large bong with "three tubes so three people can smoke at once . . . ."

3

person being questioned by the law enforcement officer." Dalton testified at the suppression hearing that Gittens agreed to talk to him and agreed to waive his rights. Dalton further testified that Gittens admitted to giving away and trading marijuana for "stuff." Van Dyken also testified as to the equipment's malfunction and that he was present when Dalton advised Gittens of his *Miranda* rights and began questioning him. Van Dyken later asked Gittens several questions and also testified that Gittens stated that he traded and gave marijuana to other people.

¶6 The State charged Gittens, by Information, with Count I—criminal possession of dangerous drugs with intent to distribute, a felony in violation of § 45-9-103, MCA, and Count II—criminal possession of drug paraphernalia, a misdemeanor in violation of § 45-10-103, MCA. Gittens pleaded not guilty to the charges. On December 27, 2004, Gittens filed a motion to suppress all the statements he made following his arrest on the ground that the State had failed to demonstrate that he was properly Mirandized. The State filed a response to Gittens' motion, and the District Court held a suppression hearing on February 8, 2005. After hearing testimony from Deputy Dalton, Deputy Ruiz, Sergeant Van Dyken, and Gittens, the District Court denied the motion to suppress.

¶7 On March 11, 2005, the State filed an Amended Information retaining the original two counts, but adding an alternative charge to Count I, namely, criminal possession of dangerous drugs, a felony, in violation of § 45-9-102, MCA. The matter went to trial on September 26, 2005, and lasted two days. Prior to voir dire, defense counsel made a motion in limine under M. R. Evid. 404(b) to prevent the State from introducing Gittens' statements to the officers that he sometimes traded marijuana for "stuff." The court

4

denied Gittens' motion, and the jury heard testimony on this matter. The jury also heard testimony from Dalton, Ruiz, Van Dyken, Gittens' former roommate Aguon, and State Crime Lab chemist Bahne Klietz. The following day, the jury found Gittens guilty of one felony count of criminal possession of dangerous drugs with intent to distribute and one misdemeanor count of criminal possession of drug paraphernalia.

¶8 The District Court sentenced Gittens to ten years at the Montana State Prison with three years suspended on Count I, and six months in the Cascade County Detention Center on Count II, the two sentences to run concurrently. This appeal followed.

## STANDARD OF REVIEW

¶9 We review a district court's decision to grant or deny a motion to suppress to determine whether the court's underlying findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those findings. *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, ¶ 17, 171 P.3d 731, ¶ 17. "A trial court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made." *Lewis*, ¶ 17.

¶10 We generally review a district court's evidentiary rulings for an abuse of discretion. *State v. McOmber*, 2007 MT 340, ¶ 10, 340 Mont. 262, ¶ 10, 173 P.3d 690, ¶ 10. A district court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *McOmber*, ¶ 10. "Notwithstanding this deferential standard, however, judicial discretion must be guided by the rules and principles of law; thus, our standard of review is plenary

5

to the extent that a discretionary ruling is based on a conclusion of law.  In such circumstance, we must determine whether the court correctly interpreted the law." *McOmber*, ¶ 10 (quoting *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, ¶ 17, 134 P.3d 45, ¶ 17).

## DISCUSSION

¶11   *Issue One.  Did the District Court err in denying Gittens' motion to suppress statements, based on the State's alleged failure to show that Gittens was properly Mirandized?*

¶12   The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution provide that people have the right not to incriminate themselves.  *In re Z.M.*, 2007 MT 122, ¶ 39, 337 Mont. 278, ¶ 39, 160 P.3d 490, ¶ 39. The Supreme Court addressed the right against self-incrimination in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).  The Supreme Court stated that "the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' "  *Miranda*, 384 U.S. at 460, 86 S. Ct. at 1620 (quoting *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S. Ct. 1489, 1493 (1964)).  "The *Miranda* Court held that the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, ¶ 13, 66 P.3d 297, ¶ 13 (citing *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612).

6

¶13     Section 46-6-107, MCA, which is a codification of the Supreme Court's holding in *Miranda*, states, in pertinent part:

> Before interrogating a person who is in custody, a peace officer shall inform the person that the person has the right to remain silent, that anything the person says can be used against the person in a court of law, that the person has the right to speak to an attorney and to have an attorney present during any questioning, and that if the person cannot afford an attorney, one will be provided for the person at no cost to the person.

The *Miranda* warnings are required where the person is subject to a custodial interrogation. *See State v. McKee*, 2006 MT 5, ¶ 28, 330 Mont. 249, ¶ 28, 127 P.3d 445, ¶ 28; *State v. Munson*, 2007 MT 222, ¶ 20, 339 Mont. 68, ¶ 20, 169 P.3d 364, ¶ 20.

¶14     An individual may waive his or her Fifth Amendment rights only if the waiver is made voluntarily, knowingly, and intelligently. *State v. Cassell*, 280 Mont. 397, 400, 932 P.2d 478, 480 (1996) (citing *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612); *State v. Lucero*, 151 Mont. 531, 538, 445 P.2d 731, 735 (1968), *abrogated on other grounds*, *State v. Reavley*, 2003 MT 298, 318 Mont. 150, 79 P.3d 270. The State has the burden to prove that the waiver of the constitutional right against self-incrimination was voluntarily, knowingly, and intelligently made. *Lucero*, 151 Mont. at 538, 445 P.2d at 735.

¶15     The police are not required to tape-record or create an audio-visual record of *Miranda* warnings and the detainee's waiver. *State v. Grey*, 274 Mont. 206, 213, 907 P.2d 951, 955 (1995). However, we have encouraged law enforcement officers "to preserve a tangible record of advising defendants of their rights and a defendant's waiver

of those rights." *Cassell*, 280 Mont. at 403, 932 P.2d at 481. Indeed, this Court held in *Grey* that

> in the context of a custodial interrogation conducted at the station house or under other similarly controlled circumstances, the failure of the police officer to preserve some tangible record of his or her giving of the *Miranda* warning and the knowing, intelligent waiver by the detainee will be viewed with distrust in the judicial assessment of voluntariness under the totality of circumstances surrounding the confession or admission.

*Grey*, 274 Mont. at 214, 907 P.2d at 956. Likewise, we stated in *State v. Lawrence*, 285 Mont. 140, 948 P.2d 186 (1997), that "law enforcement officers should preserve a tangible record of the giving and waiver of *Miranda* when the means to do so are readily available. Failure to do so will result in extreme disfavor with the Court in later determining the voluntariness of a *Miranda* waiver." *Lawrence*, 285 Mont. at 156, 948 P.2d at 195.

¶16 Gittens asserts that the State failed to show that he was properly Mirandized. In particular, Gittens contends that the absence of any "recorded proof" of the giving of the *Miranda* warnings and his purported waiver of his *Miranda* rights raises numerous questions about the interrogation. According to Gittens, "law enforcement did have means readily available to record Miranda warnings and any subsequent waiver of those rights" and "[t]here were no exigent circumstances that would have justified not recording any purported Miranda warning and subsequent waiver." Thus, he argues, "law enforcement should have properly recorded any purported Miranda warning and subsequent waiver." Gittens claims that without this recording, the State lacks clear evidence to show that he was Mirandized and that he knowingly, intelligently, and

voluntarily waived his *Miranda* rights. Accordingly, Gittens argues that the District Court erred in not suppressing his statements.

¶17 The State argues that the District Court properly denied Gittens' motion to suppress. While the State acknowledges the foregoing holding of *Grey*, the State asserts (citing *Cassell* and *Lawrence*) that the only requirement is that "the officers establish to the district court's satisfaction that the *Miranda* warnings were properly given, that no impermissible tactics were used, and that under the totality of circumstances the confession was voluntary." The State contends that these requirements were met by the testimony of Deputy Dalton and Sergeant Van Dyken.

¶18 At the outset, we note that two facets of Gittens' position on appeal circumscribe our analysis. First, Gittens focuses entirely on the sufficiency of the State's proof that he was Mirandized and waived his *Miranda* rights. He does not expressly claim or present an argument that his statements were otherwise involuntary. *See State v. Jones*, 2006 MT 209, ¶¶ 20-21, 333 Mont. 294, ¶¶ 20-21, 142 P.3d 851, ¶¶ 20-21 (Whether an accused was advised of his or her *Miranda* rights is but one factor to be considered in determining whether a confession or admission was given involuntarily.).

¶19 Second, Gittens' motion to suppress was directed at "all statements" he made "after his arrest on September 24, 2004." Likewise, on appeal, Gittens asserts that "any statements" he made "after his arrest" should have been suppressed. According to Dalton, he placed Gittens under arrest upon making contact with Gittens in the back yard, but did not read Gittens the *Miranda* warnings until after the search of the house. Yet, Gittens does not identify any particular statements that he made in the interim between

9

his arrest and the *Miranda* warnings. More importantly, he does not offer an analysis of whether any such statements were volunteered, *see e.g. State v. Saxton*, 2003 MT 105, ¶ 39, 315 Mont. 315, ¶ 39, 68 P.3d 721, ¶ 39, or made pursuant to a "custodial interrogation," *see Munson*, ¶¶ 21-25. Rather, as just noted, his argument is directed at the sufficiency of the State's proof that he was Mirandized and that he waived his *Miranda* rights. Accordingly, we will not consider the matter of any "interim statements" further. *See In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6; M. R. App. P. 12(1)f. Our analysis will focus specifically on whether the District Court correctly concluded that the State's proof was sufficient.

¶20    Turning now to that question, we disagree with Gittens' suggestion that the lack of "recorded proof" of the purported reading and waiver of his *Miranda* rights compels the suppression of his statements. Gittens reads our cases too broadly. Indeed, we have explicitly recognized that circumstances may preclude the creation of a tangible record. *See e.g. Grey*, 274 Mont. at 214, 907 P.2d at 956 ("We recognize, as one example, that an officer Mirandizing a suspect in the field at the time of arrest, may not be able to preserve a tangible record of his or her giving of the warning or of the accused's waiver."). Thus, our statements that the failure to preserve a tangible record will result in "distrust" and "extreme disfavor" have been directed at situations in which the means to preserve a tangible record were readily available, but the officers failed to avail themselves of those means. *See Lawrence*, 285 Mont. at 156, 948 P.2d at 195 ("[L]aw enforcement officers should preserve a tangible record of the giving and waiver of *Miranda when the means to do so are readily available*." (emphasis added)); *Grey*, 274 Mont. at 214, 907 P.2d at 956

10

("[I]n the context of a custodial interrogation conducted *at the station house or under other similarly controlled circumstances*, the failure of the police officer to preserve some tangible record . . . will be viewed with distrust." (emphasis added)).

¶21    Moreover, while we have said that the failure to preserve a tangible record when the means to do so are readily available results in extreme disfavor with the Court, we have never said that the lack of a tangible record *mandates* suppression of the detainee's statements. Rather, this is simply one factor that weighs heavily against the State in meeting its burden. Accordingly, the proper inquiry is whether, based on *all* of the available evidence, the State has met its burden of proving that the officer read the detainee his or her *Miranda* rights and the detainee waived those rights voluntarily, knowingly, and intelligently. Accordingly, we will consider whether the District Court erred in concluding that the State met its burden of proof in light of all of the available evidence.

¶22    There was a factual dispute between Gittens and the State at the suppression hearing as to whether Gittens was Mirandized. Gittens testified that Dalton never advised him of his *Miranda* rights and only asked him, "You know your rights, right?" to which Gittens claims he replied, "I guess." Gittens explained this response as follows: "I kind of understood because I've been in that situation before, but he didn't get into -- where he was supposed to be." Gittens alleged that Dalton never got specific. Gittens stated that Dalton never offered him a written waiver and that he did not know of his rights because he was not informed of them.

11

¶23 In contrast, Dalton testified that whenever he advised a suspect of his or her *Miranda* rights, he used a card with the text of the warnings printed on it. Dalton confirmed that he used this card when he read Gittens his rights, and Dalton read the text of the card into the record at the suppression hearing. The card stated:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have your lawyer present while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you free of any cost to you. You can decide at any time to exercise these rights and not answer any questions or make any statements.

Dalton further testified that the card contained a section stating: "Waiver after giving Miranda ask, 'Do you understand each of these rights? And secondly, knowing these rights, do you wish to talk to me now?' "

¶24 Dalton explained that after the search of the house and the discovery of the marijuana and drug paraphernalia, he took Gittens out to the front of Dalton's patrol car, pulled the *Miranda* card out of his pocket, read Gittens his rights, and asked him if he understood them. Dalton testified that he specifically asked Gittens, "Do you understand each of these rights?" and, "knowing these rights, do you wish to talk to me now?" Dalton stated that Gittens replied "yes" to both questions. Dalton explained that the reason for reading Gittens his rights in front of the patrol car was because the car had a video camera and audio recorder and Dalton wanted to record Gittens being read his rights.

¶25 Dalton testified that he believed the audio and video equipment was working and it was never his intention not to have audio. When asked at the suppression hearing

whether he had any explanation for why the audio recorder malfunctioned, Dalton explained that the battery in his microphone may have been dead or the microphone may have been turned to the wrong channel. Dalton testified that he had every intention of getting both the *Miranda* warning and Gittens' statement on the tape with audio and video. Dalton stated that the reason he did not obtain a written waiver was because he believed he was recording the reading of Gittens' rights, but if he had known the audio was malfunctioning, he would have obtained a written waiver. Dalton further testified that Gittens followed him voluntarily out to the patrol car, that Gittens never gave any indication he did not want to talk to Dalton, that Gittens never availed himself of his *Miranda* rights, and that there was never any indication that his statement was anything other than voluntary.

¶26 Van Dyken testified that he was present when Dalton advised Gittens of his rights and interviewed him. Van Dyken confirmed that Dalton took out his *Miranda* card and read Gittens his rights and that Gittens replied affirmatively that he understood his rights and was willing to talk to Dalton. Van Dyken indicated that the process was very much "by the book." Van Dyken further remarked that he was not aware the audio had malfunctioned and that it was also his intention that the warning and any subsequent statement be recorded.

¶27 After hearing testimony from Dalton, Van Dyken, and Gittens, the District Court found that Gittens was in custody and that he was Mirandized. The court further found that there was no indication of coercion or inducement. The court found that Gittens was

13

not impaired and that he waived his rights voluntarily.[2]  In making these findings, the court found the officers' testimony to be credible, whereas it found Gittens' testimony not to be credible.

> It is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court.  We defer to the district court in cases involving conflicting testimony because we recognize that the court had the benefit of observing the demeanor of witnesses and rendering a determination of the credibility of those witnesses.

*State v. Bieber*, 2007 MT 262, ¶ 23, 339 Mont. 309, ¶ 23, 170 P.3d 444, ¶ 23.  Accordingly, we defer to the District Court's determination that Dalton's and Van Dyken's testimony was more credible than Gittens' testimony.

¶28    Gittens relies on *Grey* in making his argument that the District Court erred in denying his motion to suppress; however, the facts in *Grey* can be distinguished from those present here.  In *Grey*, we concluded that the police gave mere lip service to the *Miranda* requirements.  *Grey*, 274 Mont. at 213, 907 P.2d at 955.  Whereas the officer in *Grey* testified that he could not remember exactly what he told Grey in giving Grey his *Miranda* rights, Dalton specifically recalled that he read Gittens his rights from the card Dalton carried with him and that he read from this card when he Mirandized Gittens.  In *Grey*, the officer chose not to use a waiver form because "he did not want to jeopardize

---

[2] We note that the District Court did not enter any written findings of fact with respect to Gittens' suppression motion.  Rather, the court's written order simply refers to "the reasons stated on the record."  In *State v. Stoumbaugh*, 2007 MT 105, 337 Mont. 147, 157 P.3d 1137, we observed that "a district court's rendering of findings of fact and conclusions of law from the bench can quite easily be inadequate.  Without careful drafting, issues can be overlooked and a decision issued which is insufficient for appellate review, resulting in remand." *Stoumbaugh*, ¶ 31.  We therefore urged the district courts "to resolve factual and legal issues regarding suppression by way of a written order." *Stoumbaugh*, ¶ 31.  We do so again here.

the interrogation." *Grey*, 274 Mont. at 213, 907 P.2d at 955. In contrast, Dalton testified that the reason he did not obtain a written waiver from Gittens was because he believed that the reading of Gittens' rights and subsequent waiver were being recorded on audio and video. Dalton's and Van Dyken's testimony reflects that they made a good-faith effort to preserve a record of the reading and waiver. In *Grey*, the police used impermissible procedures and tactics, including making false statements, in order to obtain Grey's confession. *Grey*, 274 Mont. at 212, 907 P.2d at 955. In comparison, the hearing testimony supports the District Court's finding that Dalton and Van Dyken did not use coercive tactics, and there is no credible evidence to suggest that Gittens' statements were anything but voluntary. Finally, Dalton and Van Dyken both testified that Gittens made an express, verbal waiver of his rights, whereas the officer in *Grey* testified that Grey impliedly waived his rights by agreeing to talk with the officers. *Grey*, 274 Mont. at 213, 907 P.2d at 955. *Grey* clearly is factually distinguishable from Gittens' situation.

¶29 Based on all of the available evidence surrounding the reading and waiver of Gittens' *Miranda* rights, we hold that the District Court did not err in concluding that the State met its burden of showing that those rights were read to Gittens and that he voluntarily, knowingly, and intelligently waived them. The District Court found that law enforcement officers Mirandized Gittens by way of reading him the *Miranda* warnings on Dalton's card. The District Court further found that Gittens was not impaired and that he waived his rights voluntarily. Substantial credible evidence supports these findings. While there is no tangible record of Dalton reading Gittens his rights or the subsequent

15

waiver, we are satisfied from all the available evidence that the State's burden of proof was met. Accordingly, we hold that the District Court did not err in denying Gittens' motion to suppress.

¶30 ***Issue Two. Did the District Court err in admitting testimony that Gittens claimed was inadmissible evidence of other crimes, wrongs, or acts under M. R. Evid. 404(b)?***

¶31 During trial, the following exchange occurred between the prosecutor and Dalton:

> Q. . . . Okay. Deputies [sic] Dalton, former Deputy Dalton, again, did the defendant answer you as to where the marijuana came from?
> A. Yes.
> Q. And what was his response?
> A. That he purchased it from a person from out of town.
> Q. Okay. Did you ask him if he sold the marijuana?
> A. Yes, I did.
> Q. Why? Why did you ask that question?
> A. Because of the scale, the baggies, all indicated, and the large amount of marijuana there, the baggies, the scale all indicated to me that it was being packaged for resale.
> Q. Okay. And this again is from your training?
> A. That's correct.
> Q. Did you ask him how he could afford the quantity?
> A. Yes, I did.
> Q. What was his response?
> A. He did not respond.
> Q. Okay. Did you ask him what he did with that quantity?
> A. Yes. He said he gave it to people. He traded it for stuff. And he used it for himself personally.
> Q. Okay. So he gave it to people. Did he explain how he gives it to them?
> A. He said that he'd throw a party at the house and just let people smoke marijuana there at his house, or would just trade the marijuana for, again, stuff. He didn't elaborate what the stuff was. But he traded it or gave it away.

Prior to voir dire, Gittens moved to exclude this testimony on the ground it violated M. R. Evid. 404(b). The District Court denied his motion, reasoning that Gittens'

16

statement that he "traded [the marijuana] for stuff" was "a part of this transaction." In addition, Gittens renewed his objection immediately prior to the foregoing testimony by Dalton, and the court overruled the objection.

¶32 M. R. Evid. 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶33 In *State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991), we modified the rule, first established in *State v. Just*, 184 Mont. 262, 602 P.2d 957 (1979), for determining the admissibility of other crimes, wrongs or acts under Rule 404(b). The four elements of the Modified *Just* Rule are:

> (1) The other crimes, wrongs or acts must be similar.
> (2) The other crimes, wrongs or acts must not be remote in time.
> (3) The evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
> (4) Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Matt*, 249 Mont. at 142, 814 P.2d at 56.

¶34 We observed in *Matt* that the Modified *Just* Rule incorporates the various purposes described in Rule 404(b) and, therefore, eliminated the limitation that evidence is admissible only if it shows a common scheme, plan or system. *Matt*, 249 Mont. at 142, 814 P.2d at 56. In addition, we noted that the Modified *Just* Rule includes the limiting

17

factors set forth in M. R. Evid. 403. *Matt*, 249 Mont. at 142, 814 P.2d at 56. Finally, "[a]s a safeguard we require that evidence of other crimes may not be received unless proper notice has been provided to the defendant of the State's intent to use such evidence and the State has indicated the purpose for which the evidence will be introduced." *Bieber*, ¶ 56.

¶35 Gittens contends that his statements concerning what he did with the marijuana constituted evidence of other crimes, wrongs, or acts pursuant to M. R. Evid. 404(b) and that the statements, therefore, were inadmissible under M. R. Evid. 404(b), since they did not meet the requirements of the Modified *Just* Rule. More specifically, Gittens claims that the second and fourth criteria of the Modified *Just* Rule were not met. In addition, Gittens contends that this evidence was not specific to the alleged offense and was highly prejudicial, that the State failed to provide him with the required notice, and that the District Court deprived him of a fair opportunity to have a hearing on the admissibility of the testimony.

¶36 The State argues that Gittens' statements were admissible under an exception to the Modified *Just* Rule for acts that are inextricably or inseparably linked with the charged offense. Under this exception, evidence of such acts is admissible, notwithstanding the substantive and procedural criteria of the Modified *Just* Rule. *See State v. Buck*, 2006 MT 81, ¶ 75, 331 Mont. 517, ¶ 75, 134 P.3d 53, ¶ 75. In *State v. Lozon*, 2004 MT 34, 320 Mont. 26, 85 P.3d 753, we noted:

> a longstanding distinction exists between Rule 404(b) "other crimes" evidence and evidence of a defendant's misconduct which is inseparably related to the alleged criminal act. Where the evidence at issue is not

wholly independent or unrelated to the charged offense, it is not "other crimes" evidence and the prosecution is not required to comply with the notice requirements of *Just* and *Matt*.

*Lozon*, ¶ 12.

¶37 The transaction rule (§ 26-1-103, MCA) is the codification of the exception to the Modified *Just* Rule. *State v. Marshall*, 2007 MT 198, ¶ 16, 338 Mont. 395, ¶ 16, 165 P.3d 1129, ¶ 16. The transaction rule states: "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Section 26-1-103, MCA. "Pursuant to the transaction rule, prior acts that are 'inextricably linked to, and explanatory of, the charged offense are admissible notwithstanding the rules relating to "other crimes" evidence.' " *Marshall*, ¶ 16 (quoting *Buck*, ¶ 76).

¶38 We agree with the State that Gittens' statements to Dalton were admissible under the transaction exception to the Modified *Just* Rule, as the statements were inextricably linked to the charged offense of possession of dangerous drugs with intent to distribute. Gittens made his statements in an interview with Dalton after being Mirandized. The transcript reveals that Dalton's questions pertained specifically to the drugs and drug paraphernalia found in the basement. Dalton testified:

> I asked him if he remembered giving me consent to search the basement, the house and the basement in particular, if he responded, if he remembered responding to me about the drugs and drug paraphernalia, asked him who they were, where he was getting it, where he was purchasing it from, whether or not he was growing, that type of thing.

Furthermore, as reflected in the dialogue quoted in ¶ 31, Dalton's questions were specifically addressed to "that quantity" of marijuana—i.e., the marijuana he and Ruiz

had found in the basement. On cross-examination, defense counsel asked Dalton about Gittens' statement that he sometimes trades or gives marijuana away, and Dalton reiterated that his questions pertained specifically to the marijuana found in the basement. Defense counsel took issue with the fact that Gittens never told Dalton of his intention to give away or trade the marijuana—specifically, that Gittens never used the word "intent." However, simply because Gittens never used the word "intent" does not prevent a jury from finding, based on the surrounding facts and circumstances testified to by Dalton, that Gittens intended to distribute the marijuana. *See State v. Hall*, 249 Mont. 366, 371, 816 P.2d 438, 441 (1991) ("Because it is seldom subject to direct proof, intent must be inferred from the acts of the accused and the facts and circumstances of the offense.").

¶39 The facts here are analogous to those in *Lozon*. In *Lozon*, law enforcement officers conducted a search of the defendant's room and discovered a vial containing methamphetamine. *Lozon*, ¶ 3. Although Lozon refused to respond when asked whether the vial was his, he later stated, after being read his *Miranda* rights, that he had used methamphetamine the prior night. *Lozon*, ¶ 3. At trial, Lozon objected to testimony regarding this statement, arguing that it was inadmissible evidence of other crimes under M. R. Evid. 404(b). *Lozon*, ¶¶ 5, 9. The district court admitted the testimony and we affirmed the district court's ruling on the ground Lozon's statement was admissible under the transaction rule. *Lozon*, ¶ 14. We explained:

> His statement to law enforcement officers that he had used methamphetamine in his room the night before the search is closely related to the charged offense of possession of dangerous drugs, and is explanatory of the circumstances surrounding the offense, because it establishes his

20

knowledge and possession of drugs in his room shortly prior to the early morning search.

*Lozon*, ¶ 13. Likewise, in the case at hand, Gittens' statement that he sometimes gives or trades marijuana for "stuff" is closely related to the charged offense of possession of dangerous drugs with intent to distribute and is explanatory of the circumstances surrounding this offense.

¶40 In light of the evidence found by the officers in the house—the large quantity of marijuana, the numerous items related to the distribution of drugs, and the paraphernalia for ingesting drugs—we conclude that Gittens' statements regarding his giving away and trading marijuana were inextricably linked to the charged offense of possession of dangerous drugs with intent to distribute.

¶41 We hold that the District Court correctly interpreted and applied the transaction rule in admitting the statements Gittens made to Deputy Dalton.

### CONCLUSION

¶42 Based on all of the available evidence, the District Court did not err in concluding that the State met its burden of showing that the *Miranda* rights were read to Gittens and that he voluntarily, knowingly, and intelligently waived them. Furthermore, the District Court did not err in admitting testimony regarding Gittens' statements that he trades or gives away marijuana, as the statements were admissible under the transaction rule.

¶43 Affirmed.

/S/ JAMES C. NELSON

21

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice Jim Rice, specially concurring.

¶44   I concur with the Court's decision affirming the District Court.   However, I disagree with the Court's furtherance of the statement made in *Grey* that, under certain circumstances, an officer's testimony that *Miranda* rights were given and that a defendant waived those rights "will be viewed with distrust" by this Court in determining the voluntariness of the waiver.

¶45   "Voluntariness depends upon the totality of the circumstances." *State v. Jones*, 2006 MT 209, ¶ 20, 333 Mont. 294, ¶ 20, 142 P.3d 851, ¶ 20 (citing *State v. Reavley*, 2003 MT 298, ¶ 15, 318 Mont. 150, ¶ 15, 79 P.3d 270, ¶ 15).  Further, we have explained that the "specific question of whether a defendant has given a voluntary confession 'is largely a factual determination that is within the discretion of the district court.'"  *Jones*, ¶ 17 (citing  *State v. Hill*, 2000 MT 308, ¶ 37, 302 Mont. 415, ¶ 37, 14 P.3d 1237, ¶ 37). This is as it should be, as it falls to the district courts to hear the testimony and to make credibility determinations about that testimony.

¶46   However, in *Grey*, this Court took the district court's function to itself by holding that, when officers fail, in a "controlled circumstance," to preserve a record of the giving and waiver of *Miranda* rights, their testimony about the situation would be "viewed with

22

distrust." *Grey*, 274 Mont. at 214, 907 P.2d at 956. This presumption of distrust flies in the face of the district court's credibility and discretionary functions and the law's requirement that the totality of the circumstances be considered. It further results in the backpedaling distinguishing of that holding which is required in this opinion, and, not least of all, a negative pre-judging of the testimony of a sworn police officer. I would overrule it altogether.


/S/ JIM RICE