DA 07-0088

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 245

WILLIAM BALTRUSCH,

        Plaintiff, Appellee,
        and Cross-Appellant,

    v.

OTTO BALTRUSCH, JR.

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
                 In and For the County of Hill, Cause No. DV 1992-029
                 Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                James A. Patten, Patten, Peterman, Bekkedahl & Green, P.L.L.C.,
                Billings, Montana

        For Appellee:

                K. Dale Schwanke, Jardine, Stephenson, Blewett & Weaver, P.C.,
                Great Falls, Montana

                           Submitted on Briefs:  March 19, 2008

                                   Decided:  July 9, 2008

Filed:

_____
                         Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 William and Otto Baltrusch are brothers who entered into a partnership in the late 1940s. Without a written partnership agreement they formed Baltrusch Land & Cattle Company (Partnership) and subsequently expanded it into several other businesses, some of which were formed as corporations. In 1990 the brothers began to disagree on business-related matters. In 1992 William filed suit against Otto. Since that time, three trials and two appeals have occurred. This is the third time they have been before this Court on appeal. In the matter before us, Otto raises three issues on appeal and William raises seven issues on cross-appeal. Otto appeals various findings and conclusions included in multiple orders issued by the Montana Twelfth Judicial District Court between January 2005 and January 2007. William cross-appeals several factual findings included in orders issued between October 2004 and January 2007. We affirm.

## ISSUES

¶2 Otto's issues on appeal are:

¶3 Did the District Court err by ordering him to equalize the Partnership capital accounts?

¶4 Did the District Court err by requiring him to pay the interest incurred for Partnership farm operating loans?

¶5 Did the District Court err in its determination of value of the Partnership farm machinery and equipment?

¶6 William's issues on cross-appeal are:

¶7      Did the court err by determining 4000 shares of AgWise, Inc. are not a Partnership asset?

¶8      Did the court err by not requiring Otto to account for compensation he received from AgWise?

¶9      Did the court err by not charging Otto with insurance premiums the Partnership paid for his sons?

¶10     Did the court err by awarding Otto pre-judgment interest on FSA payments paid to William's wife, Betty?

¶11     Did the court err by not awarding pre-judgment interest on $1,621,520 Otto owes the Partnership?

¶12     Did the court err by determining William was not entitled to be compensated for indemnities given so construction projects could be performed?

¶13     Did the court err by not finding Otto obligated for personal credit card charges the Partnership paid?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶14     Much of the factual and procedural background of this dispute can be found at *Baltrusch v. Baltrusch*, 2003 MT 357, 319 Mont. 23, 83 P.3d 256 (*Baltrusch I*) and *Baltrusch v. Baltrusch*, 2006 MT 51, 331 Mont. 281, 130 P.3d 1267 (*Baltrusch II*).[1]  In summary, after more than forty years in business together, running multiple farm-related

---

[1]  In *Baltrusch II*, William attempted to recover allegedly misappropriated Partnership funds from Otto *and* Otto's wife, Frances, who had not been named as a party in *Baltrusch I*.  The District Court dismissed the action on res judicata and collateral estoppel grounds and we affirmed.  While the case contains additional factual background, it is not relevant to the case at bar and will not be referenced again in this Opinion.

and construction-related companies, the brothers began a legal battle that has spanned almost two decades. The District Court was tasked with equitably dividing the businesses, assets and expenses between William and Otto. It determined that to achieve this goal, all the agricultural and construction businesses operated by the brothers had to be liquidated.

¶15 An initial trial in December 1999 determined, among other things, the compensation for each of the brothers which included salary, benefits, and draws against capital accounts from the inception of their businesses through March 31, 1999. The District Court looked at various expenditures that were paid by the business entities through March 31, 1999, and allocated these expenditures to the responsible brother. The court categorized these company-paid expenditures as "compensation." In the court's August 2000 Order (as amended in March 2001), it noted that Otto's "compensation" had exceeded William's by more than $450,000. To equalize this element of their business-related separation, Otto was ordered to pay William one-half of this excess compensation at the time assets and cash were distributed. Additionally, the court imposed a post-judgment interest obligation on Otto for one-half of his over-compensation and certain loans and expenses. We affirmed the District Court's 2000 ruling on appeal in our December 2003 *Baltrusch I* decision.

¶16 A second trial was held in July 2003 during which the District Court divided earnings and expenses for the time between April 1, 1999, and December 31, 2002, and addressed other issues held over from the 1999 trial. The District Court issued its order in November 2004 and amended it in January and April 2005. Subsequently, a third trial

was held on May 22, 2006. This trial addressed issues involving insurance premiums that remained unresolved after the 2003 trial. Additionally, new issues arose after the 2003 trial involving stock held by Otto in AgWise, Inc., and the value of the farm personal property. The District Court issued orders addressing these claims on August 15 and October 26, 2006. It issued an amended order on January 4, 2007. Between Otto's claims on appeal and William's on cross-appeal, all of the above-referenced orders issued after the 2003 trial are before us.

¶17 In the interest of brevity, we will provide additional relevant facts only as they pertain to the specific issues below.

## STANDARD OF REVIEW

¶18 We review a district court's findings of fact to determine whether those findings are clearly erroneous. *Bonnie M. Combs-DeMaio Liv. Trust v. Colony*, 2005 MT 71, ¶ 9, 326 Mont. 334, ¶ 9, 109 P.3d 252, ¶ 9. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. *Combs-DeMaio*, ¶ 9. We review a district court's conclusions of law for correctness. *Combs-DeMaio*, ¶ 9.

## DISCUSSION

### *ISSUES ON APPEAL*

¶19 *Did the District Court err by ordering Otto to equalize the Baltrusch Land & Cattle Company partnership capital accounts?*

¶20   In July 2003 the District Court conducted a bench trial to resolve various issues that had been held over from the December 1999 trial. As noted above, the December 1999 trial addressed division of the jointly-owned property and the compensation received by each brother through March 31, 1999. The 2003 trial involved a determination and equalization of compensation received by Otto and William between April 1, 1999, and December 31, 2002. It also addressed the imbalance in the brothers' respective capital accounts.

¶21   The court issued its order in November 2004 and subsequently amended it in January and April 2005. It determined that during the relevant time period, William's compensation totaled $715,933, while Otto's totaled $939,800.23, or $223,867.23 more than William's. The court specified that William's compensation included his reported income, a ten percent retainage fee, U.S.D.A. payments, and a previously paid retainage fee. The court's calculation of Otto's compensation included draws on his Partnership capital account, U.S.D.A. payments, and the trade-in value on two vehicles used by Otto and his wife. As the court had done following the 1999 trial, Otto was instructed to equalize this over-compensation by paying William $111,933.62, plus ten percent post-judgment interest on this sum.

¶22   Additionally, the District Court observed that there was an imbalance in the partnership capital accounts—William's account held a positive balance of $821,008 while Otto's account carried a negative balance of $848,960. In other words, during the relevant time period William deposited monies into his capital account while Otto withdrew funds from his. The court ordered that Otto pay $821,008 into his capital

6

account in order to "equalize" William's capital account balance "to allow for an equal payment of partnership debts and expenses" in preparation for terminating the Partnership.

¶23 On appeal, Otto maintains that his capital draws from the farm partnership from April 1, 1999, through December 31, 2002, constituted the principal component of his $939,800.23 compensation.[2] Therefore, if his draws were considered compensation and he equalized his compensation with William's, to then require him to "pay back" his draws would be unjust. Otto also posits that the $848,960 negative balance in his capital account on December 31, 2002, stems from draws taken *before* March 31, 1999, as well as draws taken *after* March 31, 1999. He maintains that in accordance with the court's 2000 Order he equalized the capital accounts as of March 31, 1999; therefore, he should not be required to equalize them again based on a capital account balance that includes draws taken before March 31, 1999. Lastly, Otto asserts that equalization of the capital accounts is not legally necessary to dissolve the Partnership.

¶24 William counters that the court's ruling on this issue is correct. He asserts that his capital account, into which he deposited business profits and additional capital, represents an equity account and not compensation. Conversely, Otto used his capital account to withdraw funds for living expenses and other personal expenditures, i.e., as compensation, as the District Court correctly concluded. William insists that both equalizations following the 1999 and 2003 proceedings were equalizations of

---

[2] While the court found that $608,055 of Otto's $939,800 compensation were draws from his capital account, other evidence presented at trial revealed that Otto withdrew between $645,822.37 and $890,093.37 from his account between April 1, 1999, and December 31, 2002.

compensation only and not equalization of capital accounts; therefore, it is appropriate in preparation for dissolution to equalize the capital accounts. He proffers that because no capital account equalization has occurred previously, the court is not constrained to consider only capital accounts balances and draws from April 1, 1999, forward. In other words, the previous order that equalized compensation through March 31, 1999, does not apply to equalizing the capital accounts. In order to equalize these accounts, he argues, consideration of pre-April 1, 1999 draws is not proscribed.

¶25 Capital accounts reflect the partners' equity interests in the partnership. Generally, the balance of a partner's capital account represents the net amount that the partner would be legally entitled to receive ("positive balance") or obligated to pay ("deficit balance") upon the liquidation of its partnership interest. Each partner's capital account initially reflects the amount of cash and the fair market value of property that the partner contributes to the partnership. Additionally, each partner's capital account is increased by the amount of the partner's share of income, i.e., profits. A partner's capital account is reduced by cash distributions, the partner's share of the partnership's losses, deductions, and certain nondeductible expenditures. Michael A. Oberst, *The Disappearing Limited Deficit Restoration Obligation*, The Tax Lawyer, 56 Tax Law. 485 (2003).

¶26 It is fairly typical for partners to periodically take draws on future profits rather than wait until the end of the business year to divide the profits. Most partnership agreements address such draws and small partnerships frequently handle these draws informally. However, as here, problems arise when a partner draws out more than his

8

share of earned profits during a given period of time. As a result, it is common for partnership agreements to contain a clause requiring that "overdraws" against profits are considered "loans" to the overdrawn partner that must be repaid within a specified time. Denis Clifford and Ralph Warner, *The Partnership Book*, Ch. 3, 20-23 (6th Ed. Nolo Publishing 2003). As mentioned above, the Baltrusches did not have a written partnership agreement for Baltrusch Land & Cattle Co. to assist the court in determining how these brothers intended to operate the partnership. Notably, however, the brothers did enter into a partnership agreement in 1976 for the Baltrusch Brothers partnership. While not dispositive of their intentions vis-à-vis Baltrusch Land & Cattle, created decades earlier, the 1976 agreement expressly prohibited either partner from taking draws against expected profits without the knowledge and agreement of the other partner. If such draws were agreed upon and taken, the agreement required specific entries on the partnership books to record the draws. Here, Otto's draws were taken without William's approval; moreover, the entries on the Partnership books reflecting these draws were imprecise.

¶27 Upon dissolution a partnership must pay its existing debts. It must first repay debts owed to third parties, and then it must repay debts owed to partners. UPA § 40(b); § 35-10-629, MCA. If the assets of the partnership are insufficient to satisfy these debts, the loss is shared by the partners in the same proportion with which they share profits, or in the case before us, equally. It is only after all of these debts are paid that the partners can take distribution of remaining capital and profits. UPA § 40(b).

¶28 Turning to the issue at hand, our review of the District Court orders pertaining to the 1999 trial reveals that the court did not reference nor address the then-existing imbalance in the brothers' capital accounts. Rather, the court focused on calculating the amount of compensation taken by the brothers over the relevant period of time. While the court acknowledged that Otto had received compensation of more than one million dollars through draws on the "farm/ranch operation," the court did not reference William's capital account at all. Thus, the court did not address equalization of capital accounts nor indicate that, as a result of equalizing compensation, no future equalization of capital accounts would be required. We therefore conclude that the 1999 trial orders were not intended to address nor constrain any subsequent equalization of the Baltrusches' capital accounts. In this connection, we note that District Judge Simonton in his post-2003 trial orders included capital account equalization among the issues "to be decided for the period beginning April 1, 1999." While this time frame limitation is only partially accurate given the court's failure to address capital account equalization for the period prior to April 1, 1999, we conclude under the circumstances of this case it is harmless.

¶29 As noted above, Otto argues that if the withdrawn funds from his capital account constituted compensation, then to require him to "repay" his capital account would be unjust. On the other hand, if Otto's capital account is not equalized with William's, William's capital account must cover any closing liabilities or debts that remain on the Partnership's books after the other assets are depleted. This too would be unjust. In

10

essence, William's savings would finance Otto's spending. This is only one of the many conundrums presented by this complex case.

¶30 The record in this case is voluminous, the business accounting is confounding, and the legal issues are complicated. Nearly sixty years in the making, the details underlying the many accountings the Baltrusches now dispute cannot be reviewed in isolation; they are simply too interconnected and entangled. It is therefore impossible to achieve a perfectly equitable resolution that will satisfy both parties. District Judge Simonton had the benefit of hearing hours of testimony and reviewing reams of documents over the past several years. Under these difficult circumstances, he fashioned as reasonable and equitable solution to this capital accounts issue as he possibly could. Moreover, the court's findings are supported by the evidence. Consequently, we affirm.

¶31 *Did the District Court err by requiring Otto to pay the interest incurred for Baltrusch Land & Cattle Co. partnership farm operating loans?*

¶32 After initially forming the Partnership, Otto and William expanded their business enterprises to include several other businesses—some farm-related and some construction-related. Over time, Otto concentrated on managing the farm-related businesses while William devoted his time to managing the construction-related companies.

¶33 During the 2003 trial, William argued to the District Court that Otto borrowed significant sums of money to fund farm operations during the relevant years, thereby incurring interest expense. He maintained that had Otto not taken excessive draws out of the Partnership capital account, there would have been sufficient monies to fund these

11

operations, thus eliminating the need to borrow funds. As a result, William argued, Otto should be solely responsible for the interest charges. The District Court agreed and ordered Otto to repay $210,143 in interest expense incurred between April 1999 and the end of 2002.

¶34 On appeal, Otto asserts that the court erroneously treated the two brothers differently. He maintains that William borrowed considerably more from the construction companies during the same time period than Otto did from the farming companies. While acknowledging that no interest obligation was incurred as a result of William's borrowing, Otto complains that during the time William was taking and repaying loans against the construction companies, the construction companies were not making distributions to Otto. Even presuming Otto's statement is correct, his argument is unpersuasive. There is no evidence that Otto sought relief regarding William's borrowings against the construction companies; therefore, it is not relevant to the issue before us.

¶35 Otto also argues that the court incorrectly imposed this interest-reimbursement obligation based upon its conclusion that he drew more than $800,000 out of his capital account during the relevant time period and that this constituted excessive draws resulting in loans and interest expense. Once again Otto argues that by basing this decision on the balance of his capital account as of December 31, 2002, which he maintains included draws taken before April 1, 1999, the court's conclusion is incorrect and must be reversed.

¶36    Otto also opines that the court should have compared his annual draws against the farm partnership's annual operating debt rather than utilizing his cumulative draws in its analysis.  This argument is better understood by referencing the table below that was presented during the 2003 trial.  Essentially, he argues that if his 1999 draw against his capital account was approximately $160,000 and the outstanding farm debt for the same year was approximately $523,000, then it was error to conclude that but for his draws the farm partnership would not have had operating debt requiring an interest-bearing loan.

| Amounts Withdrawn | As of 3/31/99 $1,708,230 | | | | |
|---|---|---|---|---|---|
| Annual Amounts Withdrawn | | 4/1/99- 12/31/99 $159,389.35 | 2000 174,056.60 | 2001 249,443.45 | 2002 62,932.97 |
| Cumulative Totals | $1,708,230 | 1,867,619.35 | 2,041,675.95 | 2,291,119.40 | 2,354,052.37 |
| Outstanding Debt Balance | | $522,703.91 | 653,972.90 | 525,839.22 | 332,271.08 |
| Interest Expense | | $28,560.96 | 73,035.00 | 66,768.00 | 41,778.59 |

¶37    The District Court found that:

Otto "drew" in excess of $800,000 from his partnership capital account. His account has a negative balance which really means that he "borrowed" the money from the partnership.  At the same time the partnership incurred an interest expense of $210,143 on operating loans.  It appears that interest expense is the result of Otto's capital account being out of balance.

The court later concluded that:

Otto shall repay $210,143 in interest expense incurred by the farm partnership as a result of his requiring the partnership to borrow money to pay his compensation and pay business expenses.  Had he properly budgeted the money available for other than enhancing his compensation, the partnership interest expense would not have been necessary.  To the

13

extent that the partnership has benefited by income tax savings from that expense, the amount payable by Otto shall be reduced.

¶38 It is unclear whether the court's finding is based exclusively on Otto's draws between April 1, 1999, and December 31, 2002, or on his December 2002 negative capital account balance which may have included pre-April 1, 1999 withdrawals, or both. This gap in the court's explanation, however, does not render its decision incorrect. As indicated above, evidence was presented that Otto withdrew between $608,055 and $890,093.37 from his capital account between April 1, 1999, and December 31, 2002. As is typical of all facets of this case, Otto's precise draws during this time simply cannot be determined with any accuracy. It is impossible to speculate on what the Partnership's financial condition would have been had Otto operated it in a different manner and had he not used his equity account to fund his personal expenses. Furthermore, as discussed above, previous trial orders did not equalize capital accounts nor did those orders address the ramifications to the Partnership of Otto running negative balances in his capital account for many years. Therefore, it is not pertinent whether the court relied on Otto's negative capital account balance or whether that balance included draws before April 1, 1999. The finding behind the court's decision pertinent to this issue is that Otto mismanaged the finances of the Partnership and that his "improper" actions resulted in the Partnership incurring these interest costs. The record supports these findings and the District Court's subsequent conclusion; therefore, we will not disturb it.

¶39 *Did the District Court err in its determination of value of the Baltrusch Land & Cattle Co. farm machinery and equipment?*

14

¶40 In response to the District Court's post-1999 trial order, all property jointly held by William and Otto was to be sold and the proceeds divided. Otto wanted to retain the tangible property associated with the farm enterprise and William wished to retain the equipment necessary for the construction operation. Consequently, the brothers agreed to have Ritchie Brothers appraise all of the equipment and each brother would purchase the desired equipment from the other. In February 2001, Ritchie Brothers conducted an appraisal of the construction-related equipment, but did not appraise the farm-related personalty because Otto did not provide the information necessary to conduct that appraisal.

¶41 Otto was dissatisfied with Ritchie Brothers' appraisal of the construction equipment. Consequently, in April 2001 he hired Ron Harmon to re-appraise it. In 2002, William paid Otto $717,235.12 for the construction-related equipment. This price was the higher of the two appraised values. Harmon also appraised the farm-related personalty at that time and valued the farm equipment at $1,621,520. Despite having sought and received this appraisal of the farm equipment from Harmon, Otto did not pay William for the farm property at that time.

¶42 In 2003, when asked again to conduct an appraisal of the farm equipment, Ritchie Brothers declined explaining that it had not examined the farm personal property in 2001, and therefore a 2003 appraisal retroactive to 2001 would not be accurate. Otto subsequently hired Craig Hilpipre to appraise the farm personalty. Hilpipre completed his appraisal in 2006 and valued the farm-related personalty at $1,059,000. In its post-

2006 trial order, the court instructed that Otto pay William the value established by Harmon in 2001.

¶43 Otto argues on appeal that the District Court erred in choosing Harmon's value over Hilpipre's. He maintains that Hilpipre's valuation method more closely replicated Ritchie Brothers' valuation method for the construction equipment. William counters that Harmon's expertise was not challenged and his appraisal was contemporaneous rather than retroactive, resulting in a more accurate value.

¶44 The court's selection of Harmon's appraisal over Hilpipre's was a factual as opposed to a legal decision. We will only disturb a court's factual findings if they are clearly erroneous. In this case, the record reveals that substantial credible evidence supports the court's ruling. Therefore, we will not disturb it.

*ISSUES ON CROSS-APPEAL*

¶45 William presents seven issues on cross-appeal. Six of these issues are direct challenges to the court's factual findings. As indicated above, and as argued by William in response to Otto's issues on appeal, we will affirm a district court's factual findings if they are supported by substantial credible evidence unless we conclude the district court misapprehended the evidence or we are convinced that a mistake has been made. When considering issues upon which conflicting evidence is presented, we will not reweigh such evidence nor substitute our evaluation of the evidence for that of the district court. Rather, we defer to the district court because we recognize that the court had the benefit of observing the demeanor of the witnesses and rendering a determination of the

16

credibility of those witnesses. *State v. Bieber*, 2007 MT 262, ¶ 23, 339 Mont. 309, ¶ 23, 170 P.3d 444, ¶ 23.

¶46 Applying this standard to William's issues on cross-appeal, we conclude it is unnecessary to present and analyze each issue's factual background. We affirm the District Court's findings on the issues presented in ¶¶ 7-8 and 10-13 on the ground that each is supported by the evidence.

¶47 The remaining issue William argues on appeal is that the District Court incorrectly attributed grain insurance premiums to the Partnership. During the 2006 trial William and Otto stipulated that the Partnership paid insurance premiums from 1999 through 2002 for a policy that insured grain elevators owned by Otto's sons as well as the grain stored within the elevators. It was undisputed that a portion of the grain stored in these elevators belonged to Otto's sons and not to the Partnership. Otto stipulated that he, rather than the Partnership, should be charged for the majority of the premiums paid during those years. These stipulated charges totaled $25,530.78. Otto maintained, however, that a portion of the grain stored in the elevators for each relevant year was actually owned by the Partnership, and therefore the Partnership was responsible for that portion of the premiums. He asserted that the total premium amount for which the Partnership was responsible was $7,218.72.

¶48 At the 2006 trial, Otto's son, Greg, testified that he maintained grain elevator storage totals and calculated the percentage of Partnership grain in the elevators as well as the stored grain that he and his brother owned. Business records reflecting these totals

17

were presented to the court. The District Court subsequently ruled that the $7,218.72 premium expense was a legitimate Partnership expense and did not attribute it to Otto.

¶49 William argues on appeal that this was error. He asserts that Otto presented no evidence to establish that any of the grain stored in his sons' elevators *on May 1* each year (the first day of the insurance policy year) was owned by the Partnership. He maintains that under § 26-1-602(11), MCA ("Things that a person possesses are owned by the person."), it is presumed that the grain in the elevators belonged to Otto's sons and as such the Partnership should not be responsible for paying any portion of the insurance premium.

¶50 While the evidence produced at trial failed to satisfy William, it did satisfy the District Court. Though the ownership percentage established may not have been established as of May 1 each year, it nonetheless reflected Partnership-owned grain was stored in the elevators during each of the relevant years. Such evidence rebutted the statutory presumption of ownership. William claims that he could not rebut Otto's contention and Greg's testimony because Otto and Greg possessed the only records pertaining to grain storage. He acknowledges that no other or better records may exist, but nonetheless criticizes the court for failing to "draw[] the obvious conclusions from Otto's and the boys' failure to produce them." We are unpersuaded and will not perpetuate this litigation on the prospect that other business records may exist to better support William's claim. The District Court had adequate evidence before it to support its ruling. Therefore, we affirm on this issue.

**CONCLUSION**

18

¶51    As noted above, this case is extraordinarily complicated by the passage of time, protracted litigation, and transactional detail. We conclude that notwithstanding the court's post-1999 herculean efforts to fashion an equitable and precise fifty/fifty split of all assets and liabilities as well as compensation and benefits earned since the late 1940s, it is unlikely that such an outcome can be perfectly achieved. Moreover, if history is our guide, it is equally unlikely that any solution reached by any court will satisfy both Otto and William. We conclude that, under these complicated circumstances, the District Court has commendably resolved the issues before it in a manner that appears to be as equitable as possible. Therefore, we affirm.

/S/ PATRICIA COTTER

We concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice Jim Rice, dissenting.

¶52    I agree with the Court that this case is extraordinarily complicated and that the District Court searched diligently for an equitable and right solution, as we all would hope for. *See* Opinion, ¶ 30. However, I believe the record clearly demonstrates that Otto is being made to re-pay his withdrawals twice. While an underlying theme of the District Court's decision, and of our decision, is Otto's apparent profligacy, the law

19

protects him from having to pay twice for his excessive draws, even for purposes of an equitable result. Accordingly, I dissent from the resolution of Issues I and II.

¶53 The District Court's error in calculating the equalization of the capital accounts following the 2003 trial is first revealed by the Court's recitation of the facts. As the Court points out, the "December 1999 [trial] determined . . . the compensation for each of the brothers which included salary, benefits, and *draws against capital accounts* from the inception of their businesses through March 31, 1999." Opinion, ¶ 15 (emphasis added). After this trial, the District Court concluded, in its August 2000 order as later amended in March 2001, that this "differential between the parties is $456,423." Thus, this was the amount Otto owed William for the difference in compensation which led to the deficit in Ottos's capital account, and Otto subsequently paid this amount to William, as documented in the Partial Satisfaction of Judgment filed in June of 2004. The calculation of the repayment amount included the $1,286,344 in draws taken by Otto from the farm/ranch operation's capital account which had led to the imbalance in the capital accounts, and the order for Otto to pay $456,423 represented the equalization remedy for the period prior to and leading up to March 31, 1999.

¶54 The second trial, held in 2003, was to divide earnings and expenses for the twenty months between April 1, 1999, and December 31, 2002. Opinion, ¶ 16. The District Court's order stemming from the 2003 trial ordered the partnership capital accounts equalized, without specifically recognizing that the first trial's calculation of compensation had included imbalances in the capital accounts. During the 2003 trial,

20

CPA Bruce Gaare testified that his calculation of the balances of the capital accounts *included* the history of the draws prior to March 31, 1999. As he explained, the calculations included "transactions or draws on charges against the capital account that were for time periods prior to March 31st, 1999" and the "capital accounts are an accumulation since the partnership began." Yet, despite this explanation, the District Court used the exact calculations of the capital account balances offered by Gaare to determine that "William's capital account at the end of 2002 was at $821,008 and Otto's was a negative $848,960." It was impossible to arrive at these figures without including the financial history of the partnership prior to March 31, 1999—the time period already considered in the 1999 trial, in which compensation (including capital accounts) had already been calculated. It is this overlap which effectively requires Otto to equalize his capital account twice for the period prior to March 31, 1999.

¶55 However, the Court concludes that the 1999 trial "did not reference William's capital account at all" and therefore "did not address equalization of capital accounts" and that the "1999 trial orders were not intended to address nor constrain any subsequent equalization of the Baltrusches' capital accounts." Opinion, ¶ 28. This conclusion is erroneous, or, at most, is true only in the sense that different labels— "compensation" verses "capital accounts"—were used during the litigation. However, use of these labels without further determination of the financial issues behind them leads to an erroneous conclusion. While the District Court, after the 1999 trial, did not specifically provide the amount of the capital draws, the court nonetheless clearly held that the $1,286,344 was the amount in draws that Otto took *more than William.*

21

Accordingly, the $1,286,344 calculated by the District Court was the amount of Otto's draws in excess of William's draws. Therefore, the 1999 trial, leading to the order for Otto to pay $456,423, effectively equalized the capital accounts for the period prior to March 31, 1999. The fact that the court labeled this payment as "equalization of compensation" rather than "equalization of capital accounts" is without financial significance for purposes of this appeal. The bottom line is that the court considered the draws on the capital accounts in calculating the compensation and therefore also equalized the capital accounts.

¶56 This case is complex, but this particular issue boils down to basic math. Otto has already paid for the imbalance in the accounts. Consequently, it was error for the District Court, during the 2003 trial, to consider evidence that included transactions from before the appropriate time period of April 1, 1999, to December 31, 2002. Those had been settled and paid by Otto.

¶57 Because I conclude that the District Court's calculation of the capital accounts was in error, I believe the District Court's subsequent calculation of interest is also in error because it was likewise based on the flawed calculation of Otto's imbalance. *See* Opinion, ¶ 37. Accordingly, I would conclude this issue was decided in error.

¶58 I would reverse.

/S/ JIM RICE